**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1922

CARLIN ROBINSON, individually, as Guardian and next Friend
of I.Y., M.Y. and A.Y., and as Personal Representative of
the Estate of Veronica Williams, Deceased; EUNICE GRAVES,

             Plaintiffs - Appellees,

        v.

DANIEL A. LIOI,

             Defendant – Appellant,

        and

BALTIMORE CITY POLICE DEPARTMENT; CLEAVEN LAWRENCE WILLIAMS,
JR.,

             Defendants.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    Catherine C. Blake, District Judge.
(1:12-cv-00192-CCB)

Argued:  March 20, 2013          Decided:  July 30, 2013

Before GREGORY and AGEE, Circuit Judges, and David A. FABER,
Senior United States District Judge for the Southern District of
West Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** James Howard Fields, Baltimore, Maryland, for Appellant. Cary Johnson Hansel, III, JOSEPH, GREENWALD & LAAKE, PA, Greenbelt, Maryland, for Appellees. **ON BRIEF:** Daniel Cox, THE COX LAW CENTER LLC, Frederick, Maryland, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Daniel Lioi ("Lioi"), a police officer with the Baltimore City Police Department ("BCPD"), filed an interlocutory appeal from the district court's denial of his Rule 12(b)(6) motion to dismiss based on his assertion of qualified immunity against plaintiffs' 42 U.S.C. § 1983 claim. For the reasons set forth below, we affirm the judgment of the district court that, on the facts alleged, Lioi is not entitled to qualified immunity.

## I.

Because this is an appeal from the denial of a motion to dismiss, the material facts as alleged in the complaint are taken as true, drawing all reasonable inferences in the plaintiffs' favor. See Jenkins v. McKeithen, 395 U.S. 411, 421-22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); Tobey v. Jones, 706 F.3d 379, 383 (4th Cir. 2013).

## A.

Veronica Williams ("Veronica" or "Mrs. Williams") and Cleaven Williams ("Cleaven" or "Mr. Williams") were husband and wife. Shortly after they married, Cleaven began to abuse Veronica, both mentally and physically. The abuse escalated over time and, eventually, Veronica not only filed assault charges against Cleaven but also went into hiding.

On November 17, 2008, Mrs. Williams appeared before the Baltimore District Court in connection with her request for a

protective order against her husband. Cleaven Williams was provided notice of the hearing and, at the conclusion of the hearing, the protective order was granted. As Veronica was leaving the courthouse that day, Cleaven attacked Veronica, stabbing her repeatedly in broad daylight just one block from the courthouse. A few days later, Veronica, who was four to six weeks pregnant at the time with the couple's fourth child, suffered a miscarriage. That same day, Veronica died as a result of the injuries she sustained. Cleaven Williams was found guilty of his wife's murder and is currently incarcerated.

As mentioned earlier, several weeks prior to her death, Veronica had filed assault charges against her husband. As a result of the assault charges, a warrant was issued for Cleaven Williams' arrest. Lioi and other officers, in violation of the procedure for service of a warrant, withheld the warrant from the domestic violence unit that was responsible for serving it. Lioi also warned Cleaven Williams about the warrant and sent him text messages to help him avoid capture. Finally, when Cleaven Williams arrived at police headquarters on November 14, 2008, Lioi refused to serve or arrest him, falsely claiming that the warrant could not be found. Lioi was later suspended when homicide investigators discovered text messages between Lioi and Cleaven Williams warning Williams and giving advice on avoiding capture.

4

B.

Carlin Robinson, as Guardian and Next Friend of Veronica's children, and Eunice Graves, Mrs. Williams' mother, filed a civil suit against Lioi, the BCPD, and Cleaven Williams. The plaintiffs allege that, due to his prior relationship with Mr. Williams, Lioi departed from normal procedures in serving the arrest warrant and thereby enabled Mr. Williams to remain free at the time he killed his wife.

The plaintiffs asserted a claim against Lioi and the BCPD for violating Mrs. Williams' due process rights under 42 U.S.C. § 1983. They also brought a § 1983 claim under Monell v. Department of Social Services, 436 U.S. 658 (1978), against the BCPD, as well as a claim against Lioi, the BCPD, and Cleaven Williams for conspiring to violate Veronica Williams' constitutional rights under 42 U.S.C. § 1985. Plaintiffs also asserted state law claims for wrongful death, survival action, battery, gross negligence, reckless endangerment, intentional infliction of emotion distress, common law conspiracy, conversion, and fraud and intentional misrepresentation.

The court granted the motion to dismiss filed by the BCPD but denied Lioi's motion to dismiss on the basis of qualified immunity. The instant appeal followed. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985) (permitting interlocutory appeals of qualified immunity determinations).

5

II.

The defense of "[q]ualified immunity shields a government official from liability for civil monetary damages if the officer's 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wiley v. Doory, 14 F.3d 993, 995 (4th Cir. 1994); (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In Saucier v. Katz, 533 U.S. 194, 195 (2001), the Supreme Court laid out a two-step process for resolving the qualified immunity claims of government officials. First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. See id. at 201. Second, a court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. See id. Courts may exercise discretion in deciding which of the two Saucier prongs "should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). A government official asserting a qualified immunity defense bears the burden of proof and persuasion. See Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003). We review the denial of a motion to dismiss on the basis of qualified immunity de novo. See Toby, 706 F.3d at 385.

A.

"As a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago Cnty. of Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). There are, however, a few limited exceptions. One such exception is where the state creates or enhances the danger. See id. at 198.[1]

---

[1] The other exception noted by the DeShaney decision, commonly referred to as the "special relationship" exception, arises when the individual and the State have a special relationship such that the State has an affirmative duty to protect the individual from harm inflicted by third parties. This "special relationship" exception arises in a custodial context because "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney, 489 U.S. at 199-200; see also Waybright v. Frederick Cnty., 528 F.3d 199, 207 (4th Cir. 2008) (A "special relationship is all but synonymous with a custodial relationship.") (internal citations and quotations omitted). As the Court noted, "[i]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." Id. at 200; see also Pinder v. Johnson, 54 F.3d 1169, 1175 (4th Cir. 1995) (en banc) ("Some sort of confinement of the injured party—incarceration, institutionalization, or the like—is needed to trigger the affirmative duty.").

The district court rejected plaintiffs' claim that the "special relationship" exception applied to their claim against Lioi because it found that Veronica Williams was not in the custody of the State at any relevant point. See J.A. at 178-79. Although the court acknowledges that plaintiffs have raised the "special relationship" exception claim on appeal, we need not address it because we agree with the district court that (Continued)

7

In DeShaney, the Winnebago County Department of Social Services (DSS) was sued for violating four-year-old Joshua DeShaney's substantive due process rights by failing to protect the child from his father's abuse. See id. at 192-95. The DSS had received a number of reports that Joshua was being abused by his father yet they failed to remove him from his father's custody. See id. at 192-93. Eventually, Joshua was beaten so badly that he suffered serious brain damage. See id. at 193. The Supreme Court held that the DSS was not liable because "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201. This language in DeShaney is commonly acknowledged as the genesis of the state-created danger doctrine.[2]

Citing DeShaney, this Court has recognized the state-created danger doctrine, noting that "[w]hen the state itself creates the dangerous situation that resulted in a victim's

---

plaintiffs have a substantive due process claim against Lioi based upon the state-created danger exception.

[2] See Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001) ("The clear implication of the Court's language, which was written in 1989, was that a state could be liable when it affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence.").

injury, the absence of a custodial relationship may not be dispositive.  In such instances, the state is not merely accused of a failure to act; it becomes much more akin to an actor itself directly causing harm to the injured party." Pinder, 54 F.3d at 1177; see also Waybright, 528 F.3d at 207-08 (referencing Pinder's acknowledgment of state-created danger theory but refusing to apply it under facts of case); Stevenson v. Martin Cnty. Bd. of Educ., 3 F. App'x 25, 31 (4th Cir. 2001) (unpublished) ("In Pinder this court was faced with a case in which it had to decide the contours of DeShaney's state-created danger exception.").  Although the Court ultimately rejected Pinder's reliance on the state-created danger exception, see Pinder, 54 F.3d at 1175, and although we have not since applied the exception, the Court's discussion in Pinder is widely acknowledged as the seminal case in this circuit on the theory. See Waybright, 528 F.3d at 207-08; Stevenson, 3 F. App'x at 31; see also Mills v. City of Roanoke, 518 F. Supp. 2d 815, 819-20 (W.D. Va. 2007) ("The leading Fourth Circuit case on the state-created danger exception is Pinder v. Johnson, 54 F.3d 1169 (4th Cir. 1995).").

This Court has acknowledged that the state-created danger exception is a narrow one and that for the doctrine to apply, there must be affirmative action, not inaction, on the part of the State which creates or increases the risk that the plaintiff

9

will be harmed by a private actor. See id. at 1175 ("It cannot be that the state commits an affirmative act or creates a danger every time it does anything that makes injury at the hands of a third party more likely."); see also Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir. 2003) (noting that a "failure to act is not an affirmative act under the state-created danger theory"); Butera v. District of Columbia, 235 F.3d 637, 650 (D.C. Cir. 2001) ("[A] key requirement for constitutional liability is affirmative conduct by the State to increase or create the danger that results in harm to the individual. No constitutional liability exists where the State actors had no hand in creating the danger but [simply] stood by and did nothing when suspicious circumstances dictated a more active role for them."); Stevenson, 3 F. App'x at 31 ("In order to create a danger, the state has to take some affirmative steps. Liability does not arise when the state stands by and does nothing in the face of danger. Failing to provide protection from danger does not implicate the state in the harm caused by third parties.") (internal citations and quotations omitted); Holloway v. City of Suffolk, 660 F. Supp. 2d 693, 698 (E.D. Va. 2009) ("Liability under the state-created danger exception means that the state has to take some affirmative step to create the danger from the third party, and the failure to provide protection from danger does not implicate the state in

10

the harm caused by the third party."). Thus, the lodestar of our analysis of the narrow state-created danger exception to the bright-line rule under DeShaney is the Pinder requirement that the government actor "itself directly caus[ed] harm to the injured party." Pinder, 54 F.3d at 1177.

Despite Lioi's attempt to characterize his behavior otherwise, it is clear that his conduct, as alleged, was far more than a mere passive failure to act; the type of omission claim which the court rejected in Pinder. To the contrary, Lioi is alleged to have conspired with Cleaven Williams "to evade capture" and "to remain free despite the finding of probable cause," thereby directly enabling him to harm Mrs. Williams. (J.A. 20, at ¶¶ 20, 23.) To paraphrase Pinder, Lioi's affirmative acts in the conspiracy with Cleaven Williams "create[d] the dangerous situation that resulted in a victim's injury." Pinder, 54 F.3d at 1177. Lioi, as alleged, was "an actor itself directly causing harm to the injured party." Id. Lioi conspired with Cleaven Williams to help Williams avoid being arrested. Lioi actively interfered with the execution of the warrant by not only failing to turn the warrant over to the proper unit with the BCPD responsible for its execution, but also by warning Mr. Williams and giving him advice about how to avoid service of the warrant. Furthermore, Lioi lied to avoid service of the arrest warrant by falsely contending that it

11

could not be found. Such acts meet the state-created danger exception under Pinder.

While courts have applied the state-created danger exception in varying contexts, the Ninth Circuit's decision in Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989), is particularly instructive. In Wood, a police officer stopped the car in which the plaintiff was a passenger, arrested the driver, and impounded the vehicle. 879 F.3d at 586. Though the stop occurred in a high-crime area, the police officer required the plaintiff to get out of the car and abandoned her to external dangers. Id. The police officer left with the vehicle and the abandoned plaintiff was subsequently raped. Id.

The Ninth Circuit allowed the plaintiff's § 1983 claim to proceed, denying the officer's qualified immunity defense because "[a] reasonable police officer who acted as [the plaintiff] alleges [the police officer] acted should have understood that what he was doing violated [the plaintiff's] constitutional right to be free from an unjustified intrusion into her personal security in violation of her liberty interest under the Fourteenth Amendment." Id. at 596. The court held that the plaintiff had raised a triable issue as to whether the officer "affirmatively placed the plaintiff in a position of danger." Id. at 589.

12

As in Wood, Lioi's alleged affirmative acts with his co-conspirator, Cleaven Williams, to avoid arrest directly enabled Mr. Williams to perpetrate the harm to Mrs. Williams. Lioi, therefore, "affirmatively placed [Mrs. Williams] in a position of danger." Id. at 589.

The Court finds unpersuasive Lioi's argument that, because a police officer has discretion in the execution of arrest warrants, see Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 764 (2005), his conduct in this case did not violate Veronica Williams' substantive due process rights and thus did not run afoul of § 1983. In Castle Rock, a father took his three daughters from their mother's yard, in violation of a restraining order. Id. at 753. Despite repeated phone calls from the mother informing them that her daughters were missing and that the restraining order had been violated, the police did nothing. Id. at 753-54. Eventually, the daughters were found to have been murdered by their father. Id. at 754.

As to the mother's 42 U.S.C. § 1983 claim that the police officers violated the Fourteenth Amendment's Due Process Clause in failing to enforce the restraining order, the Court found she did not have a property interest in police enforcement of the restraining order. Id. at 768. The Court noted that "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections

13

under the Due Process Clause, neither in its procedural nor in its substantive manifestations." Id.

The instant case is distinguishable from Castle Rock. Lioi attempts to characterize his conduct in this case as a mere failure to act. However, according to the complaint, that is a gross mischaracterization. As discussed above, Lioi's alleged conduct in this case was not confined to a failure to execute the arrest warrant. Lioi affirmatively acted to interfere with execution of the warrant by conspiring with Cleaven Williams to evade capture and remain at large. Whereas Castle Rock is, fundamentally, a case about inaction, Plaintiffs in the instant case have alleged affirmative misconduct on Lioi's part such that his actions "directly caus[ed] harm to the injured party." Pinder, 54 F.3d at 1177. Accordingly, Plaintiffs' claims are not foreclosed by Castle Rock.[3]

Lioi's affirmative acts, as alleged, were on that "point on the spectrum between action and inaction," Pinder, 54 F.3d at

---

[3] In addition, the Castle Rock decision did not even consider the state-created danger exception nor did it consider plaintiff's substantive due process claim as that claim was not before the court. See Caldwell v. City of Louisville, 200 F. App'x 430, 435 (6th Cir. 2006) (unpublished) ("There is nothing in Castle Rock that compels a conclusion the Supreme Court intended to eliminate the state-created danger exception to the DeShaney rule. This is not surprising since the Court did not have occasion to address or consider the plaintiff's substantive due process claim as it was not before the Court.").

14

1175, such that his acts created "the dangerous situation that resulted in [Mrs. Williams'] injury." Id. at 1177. Based on the foregoing, the court agrees with the district court that plaintiffs have stated a substantive due process claim against Lioi based upon the state-created danger exception.

B.

When determining whether a constitutional right was clearly established, a court asks whether the right was clearly established at the time of the conduct in question. See Pinder, 54 F.3d at 1173. A right is clearly established when the contours of the right are sufficiently clear such that a reasonable official would understand that what he is doing violates that right. Id. This inquiry is focused on whether the official was on notice that his or her conduct violated clearly established law and that the state of the law provided fair warning that the conduct was unconstitutional. Id.

A right is clearly established when it has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state in which the action arose. See Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). The relevant, dispositive inquiry is whether it would be clear to a reasonable person that the conduct was unlawful in the situation he confronted. Saucier, 533 U.S. at 195. "Clearly established"

15

does not mean that "the very action in question has previously been held unlawful," but requires the unlawfulness of the conduct to be apparent "in light of preexisting law." Wilson v. Layne, 526 U.S. 603, 615 (1999).

> The responsibility imposed on public officials to comply with constitutional requirements is commensurate with the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct. It is not measured by the collective hindsight of skilled lawyers and learned judges. * * * "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciarello v. Sumner, 973 F.2d 295, 295 (4th Cir. 1992), cert. denied, 506 U.S. 1080 (1993).

Jackson v. Long, 102 F.3d 722, 730-31 (4th Cir. 1996); see also Williams v. Hansen, 326 F.3d 569, 578-79 (4th Cir. 2003) (holding that for purposes of qualified immunity, executive actors are not required to predict how the courts will resolve legal issues). "The linchpin of qualified immunity is objective reasonableness." Pinder, 54 F.3d at 1173.

"In determining whether the specific right allegedly violated was `clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.'" Wiley v. Doory, 14 F.3d 993, 995 (4th Cir. 1994) (quoting Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992)). "Notably, however, the existence of a case holding the defendant's identical conduct to be unlawful does not prevent

16

the denial of qualified immunity." Edwards, 178 F.3d at 251; see also Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001) ("It is not necessary, however, for plaintiffs to find a case with exact corresponding factual circumstances; defendants are required to make `reasonable applications of the prevailing law to their own circumstances.'")(quoting Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1251 (10th Cir. 1999)).

Despite Lioi's assertion to the contrary, the right to be free from state-created danger has been clearly established in this circuit. See Pinder, 54 F.3d at 1177; see also Waybright, 528 F.3d at 207; Stevenson, 3 F. App'x at 31. The lack of a case directly on point does not alter the court's conclusion in this regard. As the Supreme Court has noted:

> The easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages . . . liability.

United States v. Lanier, 520 U.S. 259, 271 (1997) (internal citations and quotations omitted); Pulliam v. Ceresini, 221 F. Supp. 2d 600, 605 n.5 (D. Md. 2002) ("The lack of decisional authority defining the constitutional right in this specific context does not imply that the unlawfulness of the conduct under the Constitution is not apparent.").

17

For qualified immunity purposes, in 2008, a reasonable police officer in Lioi's position would have known that a law enforcement officer affirmatively acting in a conspiracy with a third party to avoid arrest on assault charges could give rise to a constitutional violation when the third party acts in furtherance of the conspiracy to injure another person. As this Court has stated on repeated occasions, although qualified immunity protects law enforcement officers from bad guesses in gray areas, they are liable for transgressing bright lines. See Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Lioi's conduct as alleged in the complaint was not in a gray area; he crossed a bright line.

## III.

For the foregoing reasons, the judgment of the district court denying qualified immunity to Lioi is

AFFIRMED.