**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 14-1748**

───────────────

JOHN DOE 2,

              Plaintiff – Appellant,

        v.

PRESIDENT JOHN W. ROSA, individually,

              Defendant – Appellee.

───────────────

**No. 14-1749**

───────────────

MOTHER DOE, on behalf of John Doe 3,

              Plaintiff – Appellant,

        v.

PRESIDENT JOHN W. ROSA, individually,

              Defendant – Appellee.

───────────────

Appeals from the United States District Court for the District of South Carolina, at Charleston.  Richard M. Gergel, District Judge.  (2:12-cv-00794-RMG; 2:12-cv-00795-RMG)

───────────────

Argued:  March 24, 2015          Decided:  July 28, 2015

───────────────

Before SHEDD, DUNCAN, and AGEE, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Judge Shedd and Judge Duncan joined.

---

**ARGUED**: Jacqueline LaPan Edgerton, McLEOD LAW GROUP, LLC, Charleston, South Carolina, for Appellants.  Morris Dawes Cooke, Jr., BARNWELL WHALEY PATTERSON & HELMS, LLC, Charleston, South Carolina, for Appellee.  **ON BRIEF**: W. Mullins McLeod, Jr., James B. Moore III, McLEOD LAW GROUP, LLC, Charleston, South Carolina, for Appellants.   John W. Fletcher, Randell C. Stoney, Jr., Jeremy E. Bowers, BARNWELL WHALEY PATTERSON & HELMS, LLC, Charleston, South Carolina, for Appellee.

---

AGEE, Circuit Judge:

The appellants in this consolidated appeal were the plaintiffs below, John Doe 2 and Mother Doe, on behalf of John Doe 2's younger brother, Doe 3 (together, "the Does").[1] Beginning in 2005 and continuing through July or August 2007, Louis "Skip" ReVille provided childcare for the Doe family and sexually abused the two minor boys. ReVille, a graduate of The Citadel, The Military College of South Carolina ("The Citadel"), had previously worked as a counselor at The Citadel's youth summer camp.

Defendant John W. Rosa was the president of The Citadel during the time period relevant in this case. In April 2007, his office received a phone call from the father of a former camper, who reported that a counselor at the summer camp -- later identified to be ReVille -- had molested his son in 2002. Rosa did not report the complaint to law enforcement and instead, the Does contend, took steps to conceal the allegations. The Does argue that Rosa's actions allowed ReVille to continue his abuse of Doe 2 and Doe 3 during the summer of 2007.

---

[1] Although both Doe 2 and Doe 3 were minors at the time of the events underlying this case, Doe 2 is now an adult and brings suit in his own right.

The Does brought suit against Rosa under 42 U.S.C. § 1983, alleging that Rosa had violated an affirmative duty to protect them under the Due Process Clause of the Fourteenth Amendment. The district court granted summary judgment in favor of Rosa on the ground that Rosa had no duty to protect the Does from a pre-existing danger. For the reasons explained below, we affirm the judgment of the district court.

## I. Background

The Citadel is a public military college in Charleston, South Carolina. From 1957 to 2006, it operated The Citadel Summer Camp for young children, employing current and former Citadel cadets to serve as staff and camp counselors. The Citadel housed the camp counselors on campus in rooms near the campers. In 2001, The Citadel learned that a former cadet named Michael Arpaio had sexually abused campers while working as a camp counselor from 1995 through 2001. Several victims sued the Citadel based on Arpaio's abuse and collected damages.[2]

---

[2] Consistent with the governing standard at the summary judgment stage, the facts are recounted in the light most favorable to the Does even where there are disputed events that the Does may not ultimately be able to prove. See Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 205 n.1 (4th Cir. 2014).

4

## A. Camper Doe Allegations

On April 23, 2007, Rosa's office received a phone call from the father of a former Citadel Summer Camp camper ("Camper Doe," unrelated to the plaintiffs and not a party in this case). Rosa was not present that day, and his administrative assistant referred the call to The Citadel's general counsel, Mark Brandenburg.

When Brandenburg returned the call, Camper Doe's father "asked whether [Brandenburg] was calling on behalf of President Rosa," because the family "did not want anything to fall through the cracks." J.A. 1753. The father told Brandenburg that Camper Doe had been sexually abused by a counselor known as "Skip" while attending the Citadel Summer Camp in 2002. Skip had allegedly shown Camper Doe pornography and masturbated with him and showered with the campers. The father also identified a second camper who was similarly victimized. Brandenburg then spoke on the phone with Camper Doe himself, who explained that Skip abused him and other campers in this way for over a year. J.A. 1830, 1862, 1865-1867.

Brandenburg reviewed camp records for the 2001 and 2002 years and found that Camper Doe's description matched a counselor named Louis "Skip" ReVille, who had been a Citadel cadet from 1998 to 2002. ReVille had worked as a camp counselor at the Citadel Summer Camp during the summers of 2000 to 2004

and as a tutor in The Citadel's Writing Center from August 2006 until sometime in April 2007.

Brandenburg called ReVille at the Writing Center on April 24, 2007, the day after talking with Camper Doe's father. According to ReVille, Brandenburg arranged to meet with him and Rosa's Executive Assistant, Colonel Trez. At the meeting, Brandenburg and Colonel Trez told ReVille about Camper Doe's accusations, all of which he denied. They explained to ReVille that "from the Citadel's standpoint their main concern was to protect the institution" and that during their investigation he should "lay low and stay off the campus." J.A. 2416-17, 4622.

The Does suggest that Brandenburg then terminated ReVille's employment at the Writing Center, but ReVille's time records as a Citadel tutor indicate that he last worked at the Writing Center on April 19, 2007, four days before Camper Doe's father called the Citadel. See J.A. 280. Similarly, a form that ReVille's supervisor at the Writing Center completed on March 22, 2007 lists the "Effective Date" of ReVille's "Resignation" as April 20, 2007. J.A. 279. The conflict between ReVille's testimony that he was at the Writing Center when he received Brandenburg's call on April 24, 2007 and the contradictory employment forms is not resolved in the record, but we must credit the Does' account for summary judgment purposes.

6

Brandenburg also met with the former director of The Citadel Summer Camp, Jennifer Garrott, on April 24, 2007, who disclosed that ReVille had been asked to leave his prior job at a prep school. In addition, Garrott told Brandenburg that in the summer of 2003, she caught ReVille in his barracks room alone with a camper rubbing Icy Hot on the camper's leg, which is against camp policy forbidding counselors from being alone in a room with campers -- a terminable offense.

Brandenburg reported back to Rosa by May 6, 2007 about his investigation of the allegations against ReVille. The Does contend that Brandenburg "memorialized . . . his and President Rosa's intentions" to conceal the Camper Doe complaint in a May 8, 2007 email, Appellant's Br. 9, and quote a portion of the email that states, "I am hopeful that by conducting an investigation on behalf of the school, no 'formal' investigation -- criminal or civil -- will occur." J.A. 1005. However, the Does appear to take the email out of context as it was written to provide a background explanation to a potential witness in advance of an interview by Brandenburg. Further, the Does offer no evidence that Rosa was aware of the contents of the email or ever saw it.

On July 1, 2007, Brandenburg went to Dallas, Texas to personally speak to Camper Doe and his parents. During the interview, which was recorded and transcribed, Camper Doe

provided a detailed account of the abuse, including that it happened to "about five other" boys.  J.A. 3591.  Asked whether he reported the complaint to law enforcement, Camper Doe replied, "Well, I mean, I've talked to you," and "Most of all, the thing I want the most is just to make sure that [ReVille] doesn't have a chance to do this to anyone else."  J.A. 3659-61.  Camper Doe later testified, "I would have absolutely reported it to police had I known that the Citadel didn't."  J.A. 2399.

At the close of the July 1 interview, Camper Doe's father mentioned that The Citadel had not accepted Camper Doe for admission as a cadet.  He stated that The Citadel had been "part of the root cause" of Camper Doe's problems and by admitting him could "be part of the root cause to fix him."  J.A. 288.  The father considered this "a very inexpensive way for The Citadel to say, do you know what -- we'll fix our own."  J.A. 288.[3]

## B. The Alleged Cover-Up

The Does contend that Rosa "deliberately conspired to conceal" the allegations by Camper Doe against ReVille.  J.A. 35, 61 (Compls. ¶ 25).  Jennifer Shiel, an administrative

---

[3] The Citadel considered Camper Doe for admission to its 2007 class, but could not admit him because he lacked several high school courses that the state of South Carolina required as prerequisites in order for him to matriculate.  The Citadel offered to pay for Camper Doe to take those classes at a community college and consider him for admission to the 2008 freshman class but received no response from Camper Doe.

8

assistant who worked in Rosa's office, testified that "President Rosa [was] in charge" of a "conscious effort to cover up or conceal [the] report of sexual abuse." J.A. 975. She testified that Rosa used the term "close hold," which she interpreted to mean that "only people that needed to know about it were supposed to know about it." J.A. 985. Further, Shiel testified that Brandenburg and Rosa had nearby offices and met on business at least three times a week. Brandenburg was deferential to Rosa and "there was no way that [Brandenburg] would have done something on his own without running it past [Rosa] first." J.A. 970.

The Does posit that Rosa ignored policies of both The Citadel and its summer camp that required him to report the Camper Doe claim to the Citadel Public Safety Department. J.A. 35, 61 (Compls. ¶ 29); see also Serious Incidents, Memorandum No. 39, J.A. 1376-88 (directing that when criminal activity involving someone affiliated with The Citadel as a suspect or victim occurs, the "first member of the Citadel community learning of the occurrence" is responsible for reporting it to the Public Safety Department); Summer Camp Official Camp Policies Regarding Sexual Misconduct Issues, J.A. 1389 (mandating that "[r]egardless of validity of the violation, any sexually inappropriate conduct reports concerning any camper or employee of the camp will be turned over to the Citadel Public

Safety Department"). Shiel testified that Rosa "made sure that did not happen." J.A. 976.

The Does also assert that Rosa violated The Citadel's Employee Misconduct Policy by allowing ReVille to resign his position at the Writing Center and to leave with a clean record. J.A. 37, 63 (Compls. ¶ 37). According to the Does, The Citadel policy forbids expunging molestation findings from an employee's record or terminating an investigation in exchange for the employee's resignation. J.A. 2418. The Does, however, offer no evidence that Rosa expunged findings from ReVille's record.

The Does also point to multiple policies they contend required Rosa to report sexual assault or harassment to the college's Title IX Coordinator. J.A. 37, 63 (Compls. ¶ 35); see also Sexual Assault Crisis Intervention Policy, J.A. 1415-20; Sexual Harassment, J.A. 1421-36; General Procedures for Conducting Formal Investigations of Sexual Harassment, J.A. 1437-38. In addition, the Does allege Rosa violated Title IX's requirement for an impartial investigation of sexual abuse by leaving the investigation to The Citadel's general counsel (Brandenburg) and its insurer, the South Carolina Insurance Reserve Fund. See 20 U.S.C. § 1681.

In addition to failing to report the Camper Doe allegations or initiate a proper investigation, the Does contend that Rosa actively concealed the allegations. For example, in October

10

2007, the Camper Doe complaint was omitted from a list of "possible litigation" files kept in The Citadel's General Counsel's office. J.A. 2421-34. In 2010, Camper Doe's name appeared in the list with the description "alleged sexual abuse at summer camp," but the entry was annotated as being against "Arpaio," not ReVille. J.A. 2435-38. The Does argue that this "is evidence of President Rosa's cover up" and that an accurate file, listing ReVille's name, would have notified the South Carolina Budget and Control Board that potential liability extended beyond the Arpaio sex abuse complaints. Appellant's Br. 17.[4]

As further evidence of a cover-up, the Does point out that The Citadel did not include the Camper Doe complaint in the 2007 crime statistics that it was required to keep under the Clery Act. See 20 U.S.C. § 1092(f). The Clery Act requires schools to report statistics of crimes "that are reported to local police agencies or to a campus security authority" during "the three most recent calendar years." 34 C.F.R. § 668.46. According to the Does, Rosa "effectively prevent[ed] the trigger of any duty to report pursuant to the Clery Act" by withholding

---

[4] Rosa responds that this argument "defies logic" because the South Carolina Insurance Reserve Fund, to which Brandenburg did report Camper Doe's allegations, is a division of the Budget and Control Board. Appellee's Br. 15; see also S.C. Dep't of Disabilities and Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 302 (4th Cir. 2008).

11

Camper Doe's complaint from law enforcement.  Appellant's Br. 18; see also J.A. 36, 62 (Compls. ¶ 31).

The Does also assert that The Citadel further hid the Camper Doe allegations by withdrawing a challenge to ReVille's application for unemployment benefits.  On June 8, 2007, the South Carolina Employment Security Commission found ReVille eligible for unemployment benefits due to job loss from The Citadel, and on June 20, 2007, The Citadel filed a Notice of Appeal to challenge that decision.  However, on July 5, 2007, four days after Brandenburg met with Camper Doe in Dallas, The Citadel withdrew its appeal of ReVille's unemployment benefits. ReVille testified that he believed The Citadel withdrew the challenge because Brandenburg and Colonel Trez "did not want to have anything to do with [him] as far as any kind of confrontation or anything."  J.A. 4687.

Finally, in June and September 2007, Brandenburg appeared with Rosa before The Citadel's Board of Visitors to provide information on Camper Doe's allegations against ReVille.  The Does argue that Brandenburg gave such minimal detail on the issue that the Board could not understand the true nature of the complaint.  According to a third-party investigative report commissioned by The Citadel, the Board "assumed, based on what they were told, that it was an insurance defense and civil claim matter, and believed from what they were told that this was the

12

case of a father displeased with his son's unsuccessful application for admission to the College."  J.A. 4043.

### C. ReVille's Abuse of the Does

ReVille met Doe 2 in the summer of 2005, about two years before Camper Doe's father called Rosa's office.  Doe 2 had just finished 6th Grade, and ReVille was a volunteer coach for his youth basketball team, which held practice at the prep school where ReVille worked.  At some point, ReVille invited Doe 2 to his home to help with yardwork and began sexually abusing him shortly thereafter.  ReVille testified he abused Doe 2 at least 12 times in 2005 and "three, four times a week" in 2006.  J.A. 4721-26.

ReVille became increasingly close with Doe 2 and his family, and during Doe 2's 8th grade year, ReVille was invited by the Doe family to move into their home as a part-time caregiver for Doe 2 and his younger brother, Doe 3.  ReVille then increased his abuse of Doe 2 and also began to abuse Doe 3. The abuse -- which consisted of sexual truth-or-dare games, oral sex, physical touching, and masturbation -- occurred from three to four times a week to "nearly daily" between the summer of 2006 through early 2007.  J.A. 4989, 5044, 5231-33.  In April 2007, prior to learning about Camper Doe's allegations, ReVille

13

was abusing Doe 2 approximately "two to three times a week" and Doe 3 "three to four times a week." J.A. 4730-31, 4736.

After meeting with Brandenburg and Colonel Trez on April 24, 2007, ReVille briefly curtailed his sexual abuse of the Does. However, he heard nothing further from The Citadel or law enforcement and, taking the silence as "news that [he] was not going to get in trouble," ReVille resumed the abuse before the end of May 2007. J.A. 5043-44. By that time, ReVille was no longer working at the Writing Center and used his additional free time to abuse the Does more frequently. The abuse ended by August, when the Doe family moved to Atlanta.

After leaving his employment at the Writing Center, ReVille returned to The Citadel several times, to speak to the Honor Committee and incoming freshman, and in 2010 to attend the unveiling of the remodeled Honor Court. Finally, in October 2011, Mount Pleasant, South Carolina police arrested ReVille, apparently based on separate allegations of child sexual abuse. At that time, Camper Doe's April 2007 allegations against ReVille came to light.

## D. Legal Proceedings

The Does filed two complaints against Rosa (one each for Doe 2 and Doe 3) on March 19, 2012 in the District of South Carolina, which were later amended. The amended complaints

14

assert a substantive due process violation under 42 U.S.C. § 1983, as well as two other claims that the district court dismissed. In effect, the Does allege that Rosa caused their abuse during the late spring and early summer of 2007 by covering up the Camper Doe complaint and thereby allowing ReVille to remain a respected member of the community. J.A. 34, 62 (Compls. ¶ 34).

On June 27, 2014, the district court granted summary judgment in favor of Rosa in both cases. The district court concluded that the Supreme Court's holding in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), bars the Does' § 1983 claim because Rosa "cannot be said to have created a danger which already existed." J.A. 5244. By the time Rosa learned of the Camper Doe complaint, "ReVille had been abusing [the Does] for nearly two years and this abuse had occurred wholly independent of any act or involvement of [Rosa]." J.A. 5251. The Does therefore "c[ould ]not demonstrate that [Rosa] created or substantially enhanced the danger which resulted in [their] tragic abuse at the hands of ReVille." Id.

The Does timely appealed their respective orders, and we have jurisdiction over their consolidated appeal under 28 U.S.C. § 1291.

15

## II. Standard of Review

We review de novo the district court's grant of summary judgment. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). Summary judgment is appropriate only when the evidence shows that "there is no genuine issue as to any material fact," Fed. R. Civ. P. 56(c), such that "a reasonable jury could [not] return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In addition to construing the evidence in the light most favorable to [the Does], the non-movant, we also draw all reasonable inferences in [their] favor." World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co., Ltd., 783 F.3d 507, 512 (4th Cir. 2015).

## III. Discussion

On appeal, the Does argue that they have established a triable cause of action against Rosa under 42 U.S.C. § 1983 for the abuse that occurred after the Camper Doe allegation. They contend Rosa's alleged conduct constituted affirmative acts which created, or at least increased, the risk of their later abuse by ReVille. The Does' central argument is that the district court erred in applying the state-created danger doctrine when it concluded that Rosa was not liable because ReVille had already been abusing the Does long before the Camper Doe complaint.

## A. The State-Created Danger Doctrine

Section 1983 imposes liability on state actors who cause the "deprivation of any rights, privileges, or immunities secured by the Constitution."[5] Under established precedent, these constitutional rights include a Fourteenth Amendment substantive due process right against state actor conduct that deprives an individual of bodily integrity. See, e.g., Hall v. Tawney, 621 F.2d 607, 612-13 (4th Cir. 1980). Accordingly, state actions that result in sexual abuse of children can be actionable under § 1983. See Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 454 (5th Cir. 1994) (addressing a "student's constitutional right to bodily integrity in physical sexual abuse cases"); Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 724-25 (3rd Cir. 1989) (recognizing § 1983 liability for school administrators' "actions in adopting and maintaining a practice, custom or policy of reckless indifference to instances of known or suspected sexual abuse of students by teachers").

State actor liability, however, is significantly limited as the Supreme Court explained in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989). In that case, a child's mother brought a § 1983 action against a social

---

[5] There is no disagreement that Rosa could be a state actor for § 1983 purposes when acting in his capacity as the President of The Citadel, as The Citadel is a public university of the state of South Carolina.

17

worker and other local officials on behalf of her child, who had been beaten and permanently brain damaged by his father.  The mother alleged that the state officials failed to remove the child from his father's custody, despite repeated reports and evidence of the father's abuse, and that failure to act deprived the child of a liberty interest in violation of his due process rights.  Id. at 191.

The Supreme Court rejected DeShaney's asserted federal constitutional cause of action because

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.  Nor does history support such an expansive reading of the constitutional text.  Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression[.]"  Its purpose was to protect the people from the State, not to ensure that the State protected them from each other.

Id. at 195-96 (citations omitted).  In establishing a bright-line rule regarding due process causes of action involving the

18

state-created danger doctrine, the Court concluded that because "the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." Id. at 196-97.

The Supreme Court noted, nonetheless, that state actor liability might attach in two narrow circumstances. The first exception arises "when the State takes a person into its custody and holds him there against his will." Id. at 199-200 (sometimes referred to as the state-custody or special-relationship exception). For example, individuals confined in a penal institution or mental hospital are due certain protections by the state during the time of confinement because

> when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . . The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf.

Id. at 199-200.

The Does do not contend that their asserted cause of action can be sustained under the state custody exception.

19

The second exception, implicit in DeShaney, gives rise to the state-created danger doctrine and is at issue here.[6] In DeShaney, the Supreme Court observed that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id. at 201 (emphasis added). Under "th[o]se circumstances," the State had no constitutional duty to protect the child. Id. Thus, "When the state itself creates the dangerous situation that resulted in a victim's injury, the absence of a custodial relationship may not be dispositive." Pinder, 54 F.3d at 1177.

The leading case in the Fourth Circuit on the state-created danger doctrine is Pinder, where Ms. Pinder, the mother of three children, brought a § 1983 action against a police officer who had responded to a report of domestic violence at her home. Id. at 1171-72. Her ex-boyfriend, Pittman, had broken into Pinder's home, assaulted her, and threatened to kill her and her three children. Pinder told the investigating officer that Pittman also had threatened her in the past and had just been released

---

[6] Although commonly referred to as a second "exception" to DeShaney's general rule, we have noted that this terminology "is not strictly accurate." Pinder v. Johnson, 54 F.3d 1169, 1176 n.* (4th Cir. 1995). "Rather, 'creation' of a danger implicates the alternate framework of § 1983 liability wherein a plaintiff alleges that some conduct by an officer directly caused harm to the plaintiff." Id.

from jail for the attempted arson of her home. Fearing that Pittman could return to harm her or her children, she asked the officer whether she could safely return to work that evening. The officer assured her that Pittman would be incarcerated overnight on assault charges and could not be released until the county commissioner became available for a hearing in the morning. With that assurance, Pinder went to work that evening leaving her children at home.

Instead of the assault charge, the officer filed lesser charges against Pittman, and he was released from custody that night. Pittman then returned to Pinder's home after she had gone to work and set it on fire. Pinder's children were sleeping inside, and all three died of smoke inhalation.

Pinder then brought a § 1983 due process claim against the police officer. Lacking a custodial relationship with the state, she sought to invoke the state-created danger doctrine by alleging that the officer's assurances of Pittman's overnight detention were affirmative misconduct by a state actor that increased the danger to her children. Id. at 1175. We concluded, however, that Pinder could not sidestep the broad rule in DeShaney by "characterizing her claim as one of affirmative misconduct by the state in 'creating or enhancing' the danger, instead of an omission." Id.

21

We reasoned that if Pinder's theory was correct, "every representation by the police and every failure to incarcerate would constitute 'affirmative actions,' giving rise to civil liability." Id. Such a rule could not survive scrutiny under DeShaney:

> No amount of semantics can disguise the fact that the real "affirmative act" here was committed by Pittman, not by Officer Johnson. As was true in DeShaney, the state did not "create" the danger, it simply failed to provide adequate protection from it. In both cases, "[t]he most that can be said of the state functionaries . . . is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." Thus, like DeShaney, Pinder's case is purely an omission claim.

Id. at 1175-76 (citation omitted). In light of DeShaney, the officer lacked a "clearly established" duty under the due process clause to protect Pinder or her children and was therefore entitled to qualified immunity. Id. at 1176.

Under the narrow limits set by DeShaney and Pinder, to establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission. Put another way, "state actors may not disclaim liability when they themselves throw others to the lions," but that does not "entitle persons who rely on promises of aid to

22

some greater degree of protection from lions at large." <u>Pinder</u>, 54 F.3d at 1177.

## B. Rosa's § 1983 Liability

Given the clear rule under <u>DeShaney</u> and <u>Pinder</u>, we conclude that the Does cannot make a § 1983 state-created danger claim against Rosa. As the district court found in granting summary judgment, the Does' claim fails because they "cannot demonstrate that [Rosa] created or substantially enhanced the danger which resulted in [their] tragic abuse at the hands of ReVille."[7] J.A. 5244. ReVille began abusing the Does in 2005 and 2006, two years before Rosa could have been aware through the Camper Doe complaint that he was a pedophile. Quite simply, Rosa "could

---

[7] The Does' claim may suffer from an additional defect. Even if their theory were legally viable, it is not altogether clear that the evidence establishes Rosa's culpability. Because "principles of respondeat superior do not apply in imposing liability under § 1983," <u>McWilliams v. Fairfax Cnty. Bd. of Supervisors</u>, 72 F.3d 1191, 1197 (4th Cir. 1996), it is not enough that Rosa had general supervisory authority over Brandenburg and other Citadel employees. His "own individual actions" must violate the Does' rights. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009). Rosa did not receive the initial call from Camper Doe's father, and the Does provide at best speculative evidence that Rosa directed Brandenburg's subsequent actions. Nonetheless, because we find the claim fails as a matter of law, we need not delve further into the sufficiency of the Does' proof.

23

not have created a danger that already existed."[8]   Armijo v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1263 (10th Cir. 1998).

Nor did Rosa create or increase the risk of the Does' abuse specifically during the early summer months of 2007, as the Does posit.  As horrific as the abuse of the Does by ReVille was, nothing transpired between them and ReVille in the summer of 2007 that had not been ongoing for two years unrelated to any action by Rosa.  As DeShaney makes clear, allowing continued exposure to an existing danger by failing to intervene is not the equivalent of creating or increasing the risk of that danger.  The father's abuse in DeShaney was a pre-existent danger, and the fact that the state had taken temporary custody of the child and returned him to the father's care "d[id] not alter the analysis."  489 U.S. at 201; see also Armijo, 159 F.3d at 1263 (concluding that a state actor cannot be liable for a pre-existent danger, "even if the state put the plaintiff back in that same danger").  Here, Rosa is alleged to have done even less than the acts claimed in DeShaney and Pinder; at worst, he

---

[8] At oral argument, Rosa's counsel represented that this fact might not be dispositive if Rosa had specifically known that the Does would be victims of ongoing abuse.  But see Pinder, 54 F.3d at 1175 ("DeShaney rejected the idea that [an affirmative] duty can arise solely from an official's awareness of a specific risk or from promises of aid.").  Because this case does not present that situation, we need not address the issue.

24

failed to take actions that might have removed them from an ongoing danger that had been present for a long time.

The Does were thus placed in "no worse position than that in which [they] would have been had [Rosa] not acted at all." DeShaney, 489 U.S. at 201. There was simply nothing new about ReVille's perverted abuse of the Does in the summer of 2007 that had not already been occurring for months. Rosa did not make the Does' danger any worse, and he had no constitutional duty to save them from ReVille's existing abuse. "[T]here simply is 'no constitutional right to be protected by the state against . . . criminals or madmen,'" and a state actor's "'failure to do so is not actionable under section 1983.'" Fox v. Custis, 712 F.2d 84, 88 (4th Cir. 1983) (quoting Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982)). To paraphrase Pinder, "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by [ReVille], not by [Rosa]. As was true in DeShaney, the state did not 'create' the danger, it simply failed to provide adequate protection from it." Pinder, 54 F.3d at 1175.

In arguing for the opposite conclusion, the Does rely almost exclusively on an unpublished case Robinson v. Lioi, 536 F. App'x 340 (4th Cir. 2013). However, the state actor in Robinson substantially changed a pre-existent danger -- he did not simply fail to intervene to stop it. In Robinson, a woman

25

was stabbed and killed after a police officer, Lioi, actively conspired with her husband and enabled him to evade an arrest warrant for domestic violence, thus creating the opportunity for him to murder his wife. Though the risk of domestic abuse already existed, the officer "directly enabled [the husband] to perpetrate the harm to [the wife]" and "affirmatively placed [the wife] in a position of danger." Id. at 345 (citation and internal quotation marks omitted). Unlike here or in DeShaney, the police officer in Lioi put the victim in a far "worse position" by acting to thwart the arrest warrant. DeShaney, 489 U.S. at 201. By contrast, the Does were in no different situation with ReVille after the Camper Doe complaint than they had been the previous two years.

Even if the Does did face a new or increased risk of abuse, which they did not, their claim would still fail because the danger was not the result of Rosa's "affirmative acts."

A "key requirement" for liability under the state-created danger doctrine is that the state actor increase or create the danger through "affirmative conduct." Butera v. District of Columbia, 235 F.3d 637, 650 (D.C. Cir. 2001); see also DeShaney, 489 U.S. at 200 (observing that "it is the State's affirmative act" that "trigger[s] the protections of the Due Process Clause"); Sarji v. Kent City Bd. of Educ., 70 F.3d 907, 913 (6th Cir. 1995) ("There is no evidence that the Board took any

26

affirmative action that exposed decedent to any danger to which she was not already exposed."). The state, through its affirmative acts, must "itself create[] the dangerous situation that resulted in a victim's injury," such that "it becomes much more akin to an actor itself directly causing harm to the injured party." Pinder, 54 F.3d at 1177. "No constitutional liability exists where the State actors 'had no hand in creating the danger but [simply] stood by and did nothing when suspicious circumstances dictated a more active role for them.'" Butera, 235 F.3d at 650 (citation omitted).

"Affirmative acts," in the state-created danger context, are quite limited in scope. "It cannot be that the state 'commits an affirmative act' . . . every time it does anything that makes injury at the hands of a third party more likely." Pinder, 54 F.3d at 1175 ("If so, the state would be liable for every crime committed by the prisoners it released."). And although "inaction can often be artfully recharacterized as 'action,' courts should resist the temptation to inject this alternate framework into omission cases." Id. at 1176 n.*. The "concept of 'affirmative acts'" should not extend "beyond the context of immediate interactions between the [state actor] and the plaintiff." Id.

Here, Rosa's alleged "affirmative acts" boil down to a particular inaction: his failure to alert the authorities about

27

ReVille's past conduct. He did not follow Citadel policies and report the ReVille allegations to campus police or file required notices under Title IX. But even what the Does offered at oral argument as their strongest "affirmative act" -- failing to fully explain the allegations against ReVille at the Board of Visitors meetings in June and September 2007 -- is something that Rosa did not do. As the Does argued, Rosa "sat idly by," Oral Arg. at 3:16, and "did not correct the misperception by the Board," Appellant's Br. 20. But that course of events clearly fails to establish state actor liability under DeShaney. See 489 U.S. at 203 ("The most that can be said of the state functionaries . . . is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.").

The Does cannot "sidestep" this problem by "artfully recharacteriz[ing]" Rosa's conduct in terms of affirmative violations of Citadel policies and misrepresentations in Citadel records. Pinder, 54 F.3d at 1175-76 & n*; see Oral Arg. at 5:56 ("[Rosa] acted when he didn't do what his school policies told him to." (emphasis added)). Rosa's failure to report ReVille to the Citadel police or to a Title IX agency is an inaction on his part and not a cognizable affirmative act for liability under the state-created danger doctrine.

28

We rejected a similar argument in Pinder. Although the plaintiff "emphasize[d] the 'actions' that [the officer] took in making assurances, and in deciding not to charge Pittman with any serious offense," the failure to file more serious charges amounted to an inaction on the part of a state actor. Pinder, 54 F.3d at 1175 ("At some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused, but no such point is reached here."). Rosa's decision not to report ReVille is no different from the officer's decision not to file the more serious charges against Pittman. As in Pinder and DeShaney, the Does claim against Rosa is "purely an omission claim," and "[n]o amount of semantics can disguise the fact that the real 'affirmative act' here was committed by [ReVille], not by [Rosa]." Id. at 1175-76.

In addition, the Does' claim lacks the nexus necessary for any of Rosa's alleged conduct to be "affirmative acts." We cannot "stretch[] the concept of 'affirmative acts' beyond the context of immediate interactions between the [state actor] and the plaintiff." Id. at 1176 n.*. Here, Rosa did not meet or speak with the Does, and by all accounts, was not even aware the Does existed. Further, he could only speculate that the Camper Doe allegations were true and that ReVille would pose future danger. If anything, the case at bar stands on weaker ground than in DeShaney, in which the state-actor defendants knew the

29

child victim and were aware of the specific danger the father posed to him. The Supreme Court rejected liability there, and we must do the same here. The same distinction can be drawn to Pinder, where the officer was well aware of the potential danger to Pinder's children, but made his charging decision nonetheless. The downstream, but-for connection alleged here simply stretches the "affirmative acts" concept too far.

Here, again, the Does look only to Robinson for support, by arguing that case recognized that actions to keep a violent husband out of custody are "affirmative acts." But (in addition to being unpublished) that case featured conduct of an entirely different nature than what the Does have alleged. Lioi had "conspired with [the husband] to help [him] avoid being arrested"; "actively interfered with the execution of the warrant by not only failing to turn the warrant over to the proper unit . . . , but also by warning [the husband] and giving him advice about how to avoid service of the warrant"; and "lied to avoid service of the arrest warrant by falsely contending that it could not be found." Robinson, 536 F. App'x at 344. The conduct thus "was far more than a mere passive failure to act; the type of omission claim which the court rejected in Pinder." Id. at 344. In contrast, Rosa did not collaborate with ReVille to assist him to avoid custody or detection; he

30

merely failed to take actions that he was under no constitutional obligation to take.

**IV.**

For the foregoing reasons, the state-created danger doctrine does not impose liability on Rosa for ReVille's ongoing abuse of the Does. While Rosa's undisputed failure to act brought dishonor to him and The Citadel, it did not create a constitutional cause of action.[9] Rosa's alleged conduct neither created nor increased the danger ReVille already posed to the Does, and in any event, did not constitute cognizable affirmative acts with respect to ReVille's abuse of the Does.[10] Accordingly, the district court's judgment is

AFFIRMED.

---

[9] Rosa now agrees that The Citadel should have done more in response to Camper Doe's allegations and that the matter should have gone to the police. See J.A. 4030 ("When you read that transcript [of Camper Doe's interview], with my experience in the sexual assault world, there was much more going on than what we were led to believe (by Mark Brandenburg).").

[10] Because we agree with the district court that Rosa lacked an affirmative duty to the Does and therefore did not violate their constitutional rights, we need not address Rosa's additional argument as to qualified immunity.

31