GREGORY, Chief Judge, dissenting:
 

 In our previous decision in this case, we held that Appellants had sufficiently alleged that Appellee Deputy Major Daniel Lioi is liable for violating Veronica Williams's due process rights because he acted affirmatively to create or enhance the danger that she faced at the hands of her husband. Although Appellants have now come forward with evidence to support their section 1983 due process claim,
 the majority has abandoned our prior ruling. The majority now takes the view that the police officers' conduct amounts, as a matter of law, to nothing more than a failure to act, which is not actionable under a state-created danger theory. In so holding, the majority not only dismisses the law of this case but also takes great pains to construe the evidence that has since been developed in the improper light.
 

 At bottom, Appellants have shown that Deputy Lioi and Major Melvin Russell took affirmative steps to allow Cleaven Williams-a community leader and their acquaintance-to evade arrest until a date deemed most convenient by him, a date after he was able to fatally stab his wife. Although the officers did not know that Williams would kill his wife, they were well aware of the domestic assault charges pending against him and that his wife was afraid of him. The officers' conduct amounts to more than mere negligence, and a jury could find true the complaint's allegations-allegations we have said amount to a constitutional violation. Therefore, I respectfully dissent.
 

 I.
 

 Before I explain my disagreement with the majority, I believe it is important to review the facts of this case in the light most favorable to Appellants, the parties that did not move for summary judgment.
 

 In 2008, Williams resided in Baltimore with his wife, Veronica Williams. Williams served as the president of the Greater Greenmount Community Association. J.A. 241. Through his affiliation with the Association, Williams met members of the Baltimore City Police Department's Eastern District, including Deputy Lioi and Major Russell. J.A. 439, 444. Major Russell and Williams interacted with each other during community meetings and community walks. J.A. 441. The two men also exchanged text messages at times. J.A. 453.
 

 Williams and his wife were having problems. During one community event, Williams confided in Major Russell that he had concerns about the fact that his wife was a Jehovah's Witness and was instilling her beliefs in their children.
 

 Id.
 

 Things apparently escalated, and in October 2008, Williams pinned down his wife and cut off her hair. The following month, Mrs. Williams sought a protective order against her husband based on the October assault.
 

 At some point during the weekend of November 8, 2008, Williams called Major Russell to determine whether "it was actually true" that his wife had "got some papers on him." J.A. 706. On November 9, Mrs. Williams obtained a temporary protective order against her husband, and a warrant issued for Williams's arrest.
 

 Officer Jose Arroyo was dispatched from the Eastern District to pick up the arrest warrant from the Court Commissioner's office. J.A. 549, 580, 585. Although police department policy requires that an arrest warrant be forwarded directly from the Court Commissioner to Central Records for processing, Arroyo did not take the warrant to Central Records and instead returned directly to the Eastern District. J.A. 581, 589. Arroyo could not recall if his superior officers, including Deputy Lioi and Major Russell, ordered him to bypass the Court Commissioner. J.A. 578-79. Nonetheless, Arroyo testified in deposition that the only circumstances under which he would not have taken a warrant to Central Records were (1) if he were ordered not to, or (2) if an officer had the suspect in custody already and was transporting the suspect to Central Booking. J.A. 577-78. It is undisputed that no police officer had Williams in custody at the time.
 

 On Monday morning, November 10, Williams sent Major Russell a text message
 saying, "Call me, major." J.A. 99. Also that day, Officer Adrienne Byrd-the officer assigned to Williams's area-approached Major Russell about the warrant, which she had in hand. J.A. 445, 450, 707. Although Major Russell was not typically informed about every warrant that issued in his district, Officer Byrd "thought it was important to bring [this warrant] to [his] attention." J.A. 450. Major Russell "glossed over the warrant, read the warrant," and "saw it was for [Williams]." J.A. 451.
 

 The next day, Tuesday, November 11, Major Russell called Williams and told him that he should turn himself in, but to not "come in later in the week, like on a Friday or something, because you don't want to sit in jail the entire weekend, but you need to get in as soon as possible." J.A. 707. This advice was far from typical. J.A. 277-78.
 

 On Wednesday, November 12, Williams texted Major Russell, saying, "I would really like 2 do it on Tuesday ... I am still trying to get capital ... I only have 3000 right now ... I have some favors coming though." J.A. 100. Later that afternoon, however, Major Russell told Deputy Lioi that Williams was "scheduled" to turn himself in the following day, Thursday, November 13, at 9:00 p.m. J.A. 249. Major Russell was working the day shift, which ended around 5:00 p.m., and it was Deputy Lioi who worked the night shift. J.A. 248-49. According to Deputy Lioi, Major Russell instructed him to be at the Eastern District when Williams came to turn himself in "to make sure the process [went] well." J.A. 288. Major Russell's request was unusual; Deputy Lioi had not arrested anyone "since the late '90s." J.A. 467. Yet, because Williams was a community leader, Major Russell wanted his second-in-command to be there.
 

 Id.
 

 In fact, Deputy Lioi interpreted Major Russell's request for his presence to mean that he was to ensure the process went "smoothly" for Williams because Williams was a community leader, he "was different." J.A. 288.
 

 Meanwhile, between November 9 and 13, Eastern District officers may have attempted to serve the arrest warrant at Williams's house during unannounced "turn-ups." J.A. 707. Major Russell testified that he drove by Williams's home one night but that it was "blacked out, darked out." J.A. 451. Deputy Lioi acknowledged that it was possible the turn-ups were not conducted. J.A. 341. And Officer Byrd-whose job it was to serve the warrant-could not recall ever going to Williams's area to serve the warrant. J.A. 106, 451. In fact, after she had brought the warrant to Major Russell's attention on November 10, "[i]t was, like [she] had the paperwork in [her] hand, and then the paperwork just disappeared. Someone took it from [her]." J.A. 108.
 

 On November 13, at approximately 1:00 p.m., Williams sent Major Russell a text message advising, "I am running bhind. I should b there n 15." J.A. 101. Major Russell responded, "K."
 

 Id.
 

 When asked in deposition about this text exchange, Major Russell answered that he believed Williams was referencing his intent to turn himself in during Major Russell's shift. J.A. 480. As Major Russell explained, he did not meet with Williams, or make any arrangement to meet with Williams, apart from Williams's self-surrender. J.A. 481.
 

 Williams, in fact, did not appear at the Eastern District in the afternoon of November 13. Rather, he arrived at the district around 9:00 p.m. on that day. J.A. 257. Deputy Lioi-who was certain the warrant had issued-called Central Records and was told they did not have the warrant. J.A. 257-58. This was the first time in Deputy Lioi's twenty-year law enforcement career that a warrant existed
 for someone whom Central Records was unable to locate in the system. J.A. 289-90. Deputy Lioi then began a brief search for the warrant. J.A. 562. He contacted the Court Commissioner, the North Avenue Courthouse, and the Baltimore City Sheriff's Office.
 

 Id.
 

 Deputy Lioi was told by the Court Commissioner that a warrant had issued and could be at the courthouse, which was closed for the night. J.A. 334, 562, 631. Deputy Lioi also left a voicemail message for Major Russell. J.A. 268. Deputy Lioi had no doubt that the warrant existed and could have arrested Williams without the physical warrant. J.A. 234, 258. And although Central Booking would not put Williams in a cell without the physical warrant, the Eastern District had a "hot box" in which Deputy Lioi could have detained Williams for up to eight hours while "every absolute effort was made to locate the warrant" or overnight until the courthouse opened the next morning. J.A. 252, 456-57.
 

 Deputy Lioi, however, did not hold Williams in the hot box. Instead, he allowed Williams to wait in a public "desk area" of the station. J.A. 259-60. And rather than make "every absolute effort" to locate the warrant, Deputy Lioi searched for the warrant for a mere 20 to 30 minutes and, after not immediately finding it, let Williams leave the precinct. He told Williams that officers would contact him after the warrant was located and would then either "have him picked up" or arrange for Williams to turn himself in. J.A. 257-58. Deputy Lioi did not ask Williams about where he was staying or otherwise confirm that officers would be able to locate him after the warrant was found.
 

 After Deputy Lioi let Williams leave, Major Russell returned his call. J.A. 268. Deputy Lioi explained to Major Russell that Williams had come to the station and that Deputy Lioi let him leave because he could not locate the warrant.
 

 Id.
 

 Major Russell then told Deputy Lioi that the warrant had been "pulled."
 

 Id.
 

 Major Russell also suggested that Deputy Lioi search Officer Byrd's patrol car. J.A. 456, 458. Deputy Lioi called Officer Byrd, as Major Russell had told Deputy Lioi that she had the warrant.
 

 Id.
 

 Officer Byrd recalled receiving paperwork for Williams from either her supervisor or the person giving "roll call."
 
 [1]
 
 J.A. 105. However, as described earlier, she could not recall what happened to that paperwork, only that someone had taken it from her. J.A. 108.
 
 [2]
 
 The warrant
 was found in the window visor of Officer Byrd's patrol car in the early morning hours on Friday, November 14, about two hours after Williams left the station. J.A. 269, 283.
 

 Rather than immediately contact Williams after the warrant was found, Deputy Lioi did not speak with Williams until after 7:00 p.m. on that day-over twelve hours later. J.A. 284. Williams asked if he could turn himself in after the weekend. J.A. 277. Williams explained to Deputy Lioi that he had "some issues," including that his mother was moving out of town.
 

 Id.
 

 Williams was concerned that, as he had been warned by Major Russell, if booked on Friday, he could be in custody all weekend.
 

 Id.
 

 Deputy Lioi conferred with Major Russell, who confirmed that "after the weekend's fine."
 

 Id.
 

 Deputy Lioi then arranged for Williams to self-surrender on the following Tuesday.
 

 Id.
 

 As Deputy Lioi later explained to internal affairs, "We knew him. I felt confident that we would be able to find him." J.A. 563. This was Deputy Lioi's explanation despite the fact that officers had up to that point allegedly been unable to locate Williams to serve the warrant.
 

 Also on Friday, Deputy Lioi, at Williams's request, wrote a letter stating that Williams had been "very cooperative and willing to turn himself in," that the Eastern District verified that a warrant for second degree assault was open, and that the warrant was not at Central Records but rather "was being held at North Avenue Court House, which was closed for the night" of November 13, when Williams had attempted to self-surrender. J.A. 285, 631. This letter was written after the warrant had in fact been located at the Eastern District, yet the letter made no mention of the warrant having been found. In a text message to Deputy Lioi, Williams also asked that Deputy Lioi "leave off the Tuesday part ... thats [
 
 sic
 
 ] just for us ... I just wanted an overview of the night ... not too much detail." J.A. 686. Deputy Lioi complied. He omitted any information about Williams's scheduled self-surrender. J.A. 631.
 

 After Deputy Lioi provided the letter to Williams, Williams texted Deputy Lioi: "Thank you Dan. There is a method to my madness:-/" J.A. 101. Deputy Lioi responded, "That's what I'm afraid of," to which Williams wrote, "Its [
 
 sic
 
 ] cool:-)"
 

 Id.
 

 Deputy Lioi wrote back, saying "I trust u." J.A. 692. Williams then wrote, "Thanks ... we both have shown good favor." J.A. 693.
 
 [3]
 

 On Sunday, November 16, Williams informed Deputy Lioi that his attorney had located a different assault warrant from March 7, 2003, that was issued for a Maryland resident named Cleaven Williams. J.A. 285-86.
 
 [4]
 
 Deputy Lioi contacted Central Records' "hot desk" and confirmed that there was an outstanding warrant for a Cleaven Williams. J.A. 286. The warrant was for a black male with the address of 2928 Ruskin Court, Abingdon, Maryland. J.A. 632. The warrant contained no further identifying information, such as date of
 birth, height, or weight. J.A. 286, 632. And as Williams explained, his father was also named Cleaven Williams. J.A. 809. At Williams's request, Deputy Lioi sent him an email confirming the existence of the March 7, 2003, warrant for first-degree assault and asserting that "[t]he information in the Criminal System Inquiry Case History Display in reference to the subject of the warrant is very limited and should not be considered to be you based on the name alone." J.A. 632. The record does not show that Deputy Lioi conducted any investigation into the 2003 warrant, even though he acknowledged in deposition that he could have contacted the 2003 complainant or the jurisdiction that sought the 2003 warrant to confirm the identify of that Cleaven Williams. J.A. 288.
 

 Deputy Lioi had never written such letters before in his twenty years of law enforcement experience. J.A. 287-88. However, this was an "unusual circumstance based on the fact that we knew this guy as a community leader." J.A. 287. It was later determined that Williams was in fact the subject of the 2003 warrant. J.A. 287-88.
 

 On Monday, November 17, Williams and Deputy Lioi exchanged the following text messages:
 

 Williams: Cool ... I just left my home 2 meet w/ my lawyer ... I saw my wife drive by ... can I go home or what?
 

 Lioi: I wouldn't be alone with her. She could say you did anything. Have a witness with you if you meet.
 

 Williams: Thanks Dan.
 

 Williams: Can she do another protection order & try 2 keep me from the house?
 

 Lioi: She could, I would avoid her. She could call the police and say u have the warrant and she is afraid of you. It would force our hand to serve the warrant.
 

 J.A. 700-05. At some point after the text message exchange, at around 1:00 or 2:00 p.m. that day, Williams called Deputy Lioi from his attorney's office. J.A. 291. Deputy Lioi encouraged Williams to turn himself in that same day, rather than wait until the following day.
 

 Id.
 

 Williams commented that Tuesday, the prearranged date, was "still better."
 

 Id.
 

 At the end of the conversation, Deputy Lioi told Williams to call him after he left his attorney's office.
 

 Id.
 

 Deputy Lioi had the warrant with him at that time. J.A. 305. The parties point to no evidence in the record showing that Deputy Lioi ever logged the warrant with Central Records after it was found the previous Friday; instead, it appears that Deputy Lioi kept the warrant with him. Although Deputy Lioi knew where Williams was, he again did nothing to serve the warrant.
 

 Also on November 17, the Maryland District Court for Baltimore City held a final protective order hearing on Mrs. Williams's petition. At around 3:00 p.m., Deputy Lioi called Williams back, having not heard from him after Williams left his attorney's office. J.A. 291. Williams answered the phone and said, "hey, let me call you back."
 

 Id.
 

 Approximately forty minutes later, Mrs. Williams, who was pregnant, left the courthouse. Outside of the courthouse, Williams stabbed her multiple times in the face, head, and neck. She miscarried and died in the hospital on November 21, 2008. Williams was convicted of murder and is currently serving a life sentence.
 
 State v. Williams
 
 , No. 108350013 (Cir. Ct. Balt. City Feb. 25, 2011);
 
 State v. Williams
 
 , No. 11-0672 (Ct. Spec. App. Apr. 5, 2013) (affirming conviction).
 

 II.
 

 " Section 1983 imposes liability on state actors who cause the 'deprivation of any rights, privileges, or immunities secured
 by the Constitution.' "
 
 Doe v. Rosa
 
 ,
 
 795 F.3d 429
 
 , 436 (4th Cir. 2015),
 
 cert. denied
 
 , --- U.S. ----,
 
 136 S. Ct. 811
 
 ,
 
 193 L.Ed.2d 715
 
 (2016). Those rights include the right under the Fourteenth Amendment's Due Process Clause to be free from "conduct that deprives an individual of bodily integrity."
 
 Id.
 
 at 436-37. Although "[a]s a general matter ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause,"
 
 DeShaney v. Winnebago Cty. Dep't of Soc. Servs.
 
 ,
 
 489 U.S. 189
 
 , 197,
 
 109 S.Ct. 998
 
 ,
 
 103 L.Ed.2d 249
 
 (1989), an exception to this rule exists "[w]hen the state itself creates the dangerous situation that resulted in a victim's injury,"
 
 Doe
 
 ,
 
 795 F.3d at 438
 
 (quoting
 
 Pinder v. Johnson
 
 ,
 
 54 F.3d 1169
 
 , 1177 (4th Cir.) (en banc),
 
 cert. denied
 
 ,
 
 516 U.S. 994
 
 ,
 
 116 S.Ct. 530
 
 ,
 
 133 L.Ed.2d 436
 
 (1995) ). This exception, the state-created danger exception, applies where a state official's affirmative act created or enhanced the danger to the individual.
 
 Pinder
 
 ,
 
 54 F.3d at 1175
 
 .
 

 A.
 

 As an initial matter, I take issue with the majority's easy disregard of our prior opinion in this case. We are not merely presented for a second time with the argument that members of the Baltimore City Police Department created or enhanced the danger to Mrs. Williams and are thus liable for violations of the Due Process Clause. Rather, we are tasked with applying what we have already established as the law of this case to the facts that have been developed since the last appeal. In the previous appeal, we considered the sufficiency of Appellants' allegations against Deputy Lioi.
 
 Robinson v. Lioi
 
 ,
 
 536 F. App'x 340
 
 (4th Cir. 2013),
 
 cert. denied
 
 ,
 
 572 U.S. 1002
 
 ,
 
 134 S.Ct. 1515
 
 ,
 
 188 L.Ed.2d 449
 
 (2014).
 
 [5]
 
 In those allegations-allegations which survived a Rule 12(b)(6) motion to dismiss-Appellants asserted that Deputy Lioi "conspired with Cleaven Williams 'to evade capture' and 'to remain free despite the finding of probable cause,' thereby directly enabling him to harm Mrs. Williams."
 
 Id.
 
 at 344. We affirmed the district court's denial of Deputy Lioi's motion to dismiss, determining that Deputy Lioi's alleged actions-actively interfering with execution of the warrant by failing to turn the warrant over to the appropriate unit, warning Williams, giving Williams advice about how to avoid service, and falsely stating the warrant could not be found-were affirmative acts that created or enhanced the danger to Mrs. Williams.
 
 Id.
 
 at 344, 346.
 

 In so holding, we rejected Deputy Lioi's argument that "because a police officer has discretion in the execution of arrest warrants, his conduct in this case did not violate Veronica Williams' substantive due process rights."
 
 Id.
 
 at 345 (citation omitted). Critically, we found that the Supreme Court's decision in
 
 Town of Castle Rock, Colorado v. Gonzales
 
 ,
 
 545 U.S. 748
 
 ,
 
 125 S.Ct. 2796
 
 ,
 
 162 L.Ed.2d 658
 
 (2005), was not controlling.
 

 Id.
 

 In
 
 Town of Castle Rock
 
 , a mother of three filed suit against the town of Castle Rock, Colorado, alleging a violation of the Due Process Clause when the police did nothing to respond to requests to enforce a restraining order against her husband who later killed her daughters.
 
 545 U.S. at 751, 753-54
 
 ,
 
 125 S.Ct. 2796
 
 . The Court held that the mother had no property interest in the enforcement of the restraining order because there was no "legitimate claim or entitlement to it" where government officials retained discretion
 over enforcement.
 

 Id.
 

 at 756, 766
 
 ,
 
 125 S.Ct. 2796
 
 .
 

 We distinguished
 
 Town of Castle Rock
 
 , characterizing it as "fundamentally, a case about inaction"; yet Appellants had "alleged affirmative misconduct on Lioi's part such that his actions 'directly caus[ed] harm to the injured party.' "
 
 Robinson
 
 ,
 
 536 F. App'x at 345
 
 (alteration in original) (quoting
 
 Pinder
 
 ,
 
 54 F.3d at
 
 1177 ). Therefore, we held that Deputy Lioi's actions "were on that 'point on the spectrum between action and inaction' such that his acts created 'the dangerous situation that resulted in [Mrs. Williams'] injury.' "
 
 Id.
 
 at 345-46 (alteration in original) (quoting
 
 Pinder
 
 ,
 
 54 F.3d at 1175
 
 , 1177 ).
 

 We also rejected a defense of qualified immunity, explaining that "a reasonable police officer in Lioi's position would have known that a law enforcement officer affirmatively acting in a conspiracy with a third party to avoid arrest on assault charges could give rise to a constitutional violation when the third party acts in furtherance of the conspiracy to injure another person."
 
 Id.
 
 at 347. That is, Deputy "Lioi's conduct as alleged in the complaint was not in a gray area; he crossed a bright line."
 
 Id.
 

 The majority now does an about-face, finding that
 
 Town of Castle Rock
 
 is in fact controlling and that Appellants' evidence amounts to nothing more than omissions by Deputy Lioi and Major Russell. Despite, as discussed below, disputes with respect to several facts that support the allegations this Court previously held sufficient to show a state-created danger, the majority now holds that this case involves "only conduct that is confined to a failure to execute the warrant." Maj. Op. at 330 (emphasis omitted). This conclusion, in my view, is not only unwarranted in light of the disputed facts, but it also flies in the face of the well-established doctrine that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."
 
 TFWS, Inc. v. Franchot
 
 ,
 
 572 F.3d 186
 
 , 191 (4th Cir. 2009) (citation omitted);
 
 accord
 

 Carlson v. Boston Scientific Corp.
 
 ,
 
 856 F.3d 320
 
 , 325 (4th Cir. 2017) ;
 
 United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency
 
 ,
 
 804 F.3d 646
 
 , 666 (4th Cir. 2015) ;
 
 Winston v. Pearson
 
 ,
 
 683 F.3d 489
 
 , 498 (4th Cir. 2012) ;
 
 L.J. v. Wilbon
 
 ,
 
 633 F.3d 297
 
 , 308 (4th Cir. 2011).
 

 Rather than follow the law-of-the-case doctrine, the majority seeks to rescind our prior holding, shielding its decision to do so with the defense that we are now at the summary judgment stage. However, the law-of-the-case doctrine does not cease to have import merely because a different standard now applies at this later stage of the case. Instead, the doctrine contemplates that the same legal ruling will continue to apply despite the varying standards that may apply in subsequent stages of litigation; the court's decision of law continues to govern the "same issues
 
 in subsequent stages
 
 in the same case."
 
 TFWS
 
 ,
 
 572 F.3d at 191
 
 (emphasis added). Those subsequent stages include not only those in the same court, but "all subsequent proceedings in the same case in the trial court or on a later appeal."
 
 Everett v. Pitt Cty. Bd. of Educ.
 
 ,
 
 788 F.3d 132
 
 , 142 (4th Cir. 2015) (quoting
 
 United States v. Aramony
 
 ,
 
 166 F.3d 655
 
 , 661 (4th Cir. 1999) ). The standard applied by a reviewing court on appeal will often differ from the standard applied by the trial court. And our standard of review in a subsequent appeal may also differ from the standard under which we reviewed the case in a prior appeal. Yet the law-of-the-case doctrine continues to apply.
 
 See, e.g.
 
 ,
 
 Oberg
 
 ,
 
 804 F.3d at 657
 
 (applying law of the case established in first appeal to subsequent appeal);
 

 S.C. State Ports Auth. v. Silver Anchor, S.A. (Panama)
 
 ,
 
 23 F.3d 842
 
 , 846 (4th Cir. 1994) (finding that district court misapplied the law of the case when it considered a narrower question than that which this Court remanded for determination);
 
 Stonega Coke & Coal Co. v. Price
 
 ,
 
 116 F.2d 618
 
 , 621 (4th Cir. 1940) ("When the finding upon the first hearing was affirmed, it became the law of the case and was binding upon the parties, as well as upon the lower court, and was not subject to re-examination upon the remand.").
 

 Of course, I remain mindful of the summary judgment standard under which this appeal is reviewed. The law-of-the-case doctrine does not preclude proper application of that standard of review. Nonetheless, the fact that we are now at summary judgment by itself does not warrant a departure from the law of the case. If that were so, the doctrine would have little, if any, effect. Any legal determination made at the pleading stage would never be applicable in later stages of the case where more than the pleadings are before the court. Moreover, and ironically, it is the majority that misapplies the summary judgment standard here, as I discuss below.
 

 I am also mindful that the law-of-the-case doctrine "is not absolute" and has exceptions.
 
 Capital Inv'rs Co. v. Ex'rs of Morrison's Estate
 
 ,
 
 584 F.2d 652
 
 , 654 (4th Cir. 1978). It need not be followed where "substantially different evidence" is developed after the law of the case is decided, where "controlling authority has since made a contrary decision of law applicable to the issue," or where "the prior decision was clearly erroneous and would work manifest injustice."
 
 TFWS
 
 ,
 
 572 F.3d at 191
 
 (citations omitted);
 
 Sejman v. Warner-Lambert Co., Inc.
 
 ,
 
 845 F.2d 66
 
 , 69 (4th Cir. 1988). Adherence to the law of the case may also give way when a court's subject matter jurisdiction is in question.
 
 See
 

 Am. Canoe Ass'n v. Murphy Farms, Inc.
 
 ,
 
 326 F.3d 505
 
 , 515 (4th Cir. 2003).
 

 I cannot agree, however, that the facts developed in discovery in this case are "substantially different" such that they warrant a departure from our prior holding that the affirmative acts committed by Deputy Lioi created or enhanced the danger to Mrs. Williams.
 
 See
 
 Maj. Op. at 318-19. I also cannot agree that Appellants' burden at this stage is to present facts that "strengthen" their "earlier allegations."
 
 Id.
 
 at 320-21. We have already concluded that the allegations as pleaded-absent any strengthening-sufficiently stated a claim. Appellants' burden at this stage, a burden which I believe to be satisfied, is merely to present sufficient evidence from which a reasonable jury could find their pleaded allegations to be true.
 
 [6]
 

 "We are not writing on a blank slate, at liberty to revisit our [prior] decision ... on a whim."
 
 Winston
 
 ,
 
 683 F.3d at 498
 
 . Because the record contains sufficient evidence to support the allegations of Appellants' complaint-allegations which we have already concluded state a due process claim-I would reverse summary judgment and allow Appellants to try their case to a jury.
 

 B.
 

 On the record developed since the previous appeal, a reasonable jury could conclude that Deputy Lioi and Major Russell took several affirmative steps to allow Williams to evade arrest and that, as a result, Williams remained free from arrest long enough to stab his wife on a date on which he knew exactly where she would be.
 

 In evaluating the evidence, we must remember what Appellants' claim is and what this Court has already decided. Appellants do not claim that each of the officers' alleged actions individually resulted in Williams's wholesale escape from arrest. Nor do they claim that the officers were complicit in Williams's plan to murder his wife, or even that they knew of that plan. Appellants claim instead that Deputy Lioi and Major Russell participated in a conspiracy to allow Williams-a prominent community figure-to remain free from arrest. And it was Williams's ability to remain free from arrest until November 17, 2008, that gave him the opportunity to fatally attack his wife. Each of the officers' acts was taken in furtherance not of a conspiracy to kill Mrs. Williams, but a conspiracy to keep Williams out of jail. And because that conspiracy enhanced the danger to Mrs. Williams, we found that Appellants had successfully pleaded a due process claim under a state-created danger theory.
 
 Robinson
 
 ,
 
 536 F. App'x at 344
 
 .
 

 1.
 

 The acts performed by Deputy Lioi are undisputed. He authored two letters and several text messages regarding the events leading up to Mrs. Williams's miscarriage and death. And instead of arresting Williams, he arranged for Williams to turn himself in on the date Williams requested. No semantic acrobatics are needed to deem these actions affirmative acts and not mere omissions. Of course, what is disputed is whether these affirmative acts were in furtherance of a conspiracy to allow Williams to evade arrest-a conspiracy that ultimately enhanced the danger to Mrs. Williams. A reasonable jury could find that they were.
 

 Construed in the light most favorable to Appellants, the letters that Deputy Lioi wrote can reasonably be viewed as his attempt to assist Williams in evading arrest by any authorities presented with the letters. Though the first letter explained that Williams had attempted to turn himself in, it misleadingly omitted the fact that the warrant had been located shortly after Williams was allowed to leave the precinct and that Williams had secured another four days of freedom before he agreed to turn himself in. The subsequent email implied that Williams was not otherwise a wanted man. The email was prepared without any investigation by Deputy Lioi into the identity of the Cleaven Williams listed on the 2003 warrant, despite Deputy Lioi's testimony that he could have ascertained the proper identity.
 

 The majority concludes that these letters cannot support Appellants' claim in part because they "state facts." Maj. Op. at 321-22. Apparently, the majority believes that an affirmative act requires more than affirmative action; it also requires deceit or
 express inaccuracies. Such a rule finds no support in the law. Moreover, the mere recitation of facts or "then-existing opinions" did not, as I have highlighted, make the letters any less misleading. Deputy Lioi carefully selected the facts that he included in the letters and purposely excluded other highly relevant facts. Crafting the letters in such a way only supports Appellants' allegation that Deputy Lioi was conspiring with Williams to allow him to remain a free man a while longer; if Deputy Lioi were merely documenting the facts, with no motive to assist Williams in evading arrest, there would be no reason to cherry-pick the information he included.
 

 Indeed, the men's text message exchange suggests that Deputy Lioi's "then-existing opinions" were not so benign. Despite expressing some misgivings about Williams's request for the letters, Deputy Lioi nonetheless "trust[ed]" Williams's "method to [his] madness." J.A. 101, 692. And this letter-writing was far from routine. Deputy Lioi had never before in his twenty-year law enforcement career written such letters and confirmed he would "[p]robably not" write any such letters for someone that he did not personally know, but that Williams was an "unusual" case; the officers knew him and he was a community leader. J.A. 287-88.
 
 [7]
 
 These acts do not show simple "negligen[ce] in pursuing service of the warrant." Maj. Op. at 322. Construed in the proper light, the letters demonstrate Deputy Lioi's highly unusual acts to provide assistance to Williams, assistance aimed at keeping Williams out of police custody a while longer, assistance that Deputy Lioi otherwise has not and does not provide but provided to Williams because of his status as a community leader.
 

 Similarly, Deputy Lioi's text message exchange with Williams on the day Williams killed his wife is evidence of his participation in the conspiracy to delay Williams's arrest until the date of Williams's choosing. As with the letters, those text messages conveyed "factual information." Maj. Op. at 322. But they also advised Williams of the consequences of his failure to avoid contact with his wife: such contact could "force [the officers'] hand to serve the warrant." J.A. 705. Those text messages demonstrate, in Deputy Lioi's own words, his desire
 
 not
 
 to do his job and instead to defer to Williams's prearranged self-surrender schedule. Indeed, despite the difficult time that officers had in locating the warrant, Deputy Lioi held onto the warrant for three days without delivering it to Central Records when it was finally located. The text exchange also suggests that Deputy Lioi sought to avoid doing his job despite his knowledge that Williams could seek out his wife-the victim of domestic violence whose testimony provided probable cause for the issuance of the warrant in the first place. Deputy Lioi knew that Mrs. Williams had sought protection from her husband. Had Deputy Lioi simply not desired to serve the warrant, this might have been a different case. But Deputy Lioi communicated his desire to avoid being "force[d]" to do his job to the very subject of the arrest warrant. In doing so, Deputy Lioi went beyond simply refraining from aggressively serving the warrant. Viewing the text message exchange in combination with the letters that Deputy Lioi wrote and Deputy Lioi's arrangement with Williams to turn
 himself in on entirely his own terms, a juror could certainly conclude that his conduct assisted Williams in delaying his arrest until the date Williams selected.
 

 This affirmative conduct is distinguishable from the omissions and failures to act that we have found insufficient to show a state-created danger.
 
 See
 

 Doe
 
 ,
 
 795 F.3d at 431, 439
 
 (concluding that no affirmative act created danger when college president
 
 failed to report
 
 child abuse to law enforcement);
 
 Pinder
 
 ,
 
 54 F.3d at 1172, 1175
 
 (finding no affirmative act when officer
 
 failed to charge
 
 petitioner's ex-boyfriend with more serious crime);
 
 see also
 

 Town of Castle Rock
 
 ,
 
 545 U.S. at 753, 756
 
 ,
 
 125 S.Ct. 2796
 
 (finding no liability where police
 
 failed to respond
 
 to mother's requests to enforce restraining order against her husband). Had the developed record shown that Deputy Lioi merely sat on his hands and failed to pursue any course of action with respect to Williams's arrest, the law-of-the-case doctrine may not have applied, relieving the Court of its obligation to adhere to its prior ruling.
 
 See
 

 Carlson
 
 ,
 
 856 F.3d at 325
 
 (explaining that a court may depart from the law of the case when "a subsequent trial produc[es] substantially different evidence" (internal citation omitted)). In that case, this matter may very well have fallen neatly in line with
 
 Doe
 
 ,
 
 Pinder
 
 , and
 
 Town of Castle Rock
 
 , as the majority holds. But the record shows that Deputy Lioi chose to act. And his conduct "was far more than a mere passive failure to act"; it could reasonably be construed by a jury as affirmative action to permit Williams to "remain free despite the finding of probable cause" for his arrest.
 
 Robinson
 
 ,
 
 536 F. App'x at 344
 
 .
 

 2.
 

 As for the evidence of Major Russell's conduct, a reasonable jury could likewise conclude that he took affirmative steps, similar to those which we previously held to constitute affirmative acts, to allow Williams to remain at large until Williams himself determined the most convenient time for his arrest.
 

 Like with Deputy Lioi, the record shows that Williams had a relationship with Major Russell. J.A. 439, 444. It is undisputed that the two texted each other and spoke of personal matters and that Major Russell instructed Deputy Lioi to ensure that Williams's self-surrender went "well" and "smoothly." J.A. 288. The fact that Major Russell
 
 said
 
 that he did not ask Deputy Lioi to give Williams any special treatment does not change the other record evidence showing that Major Russell did, in fact, treat Williams differently.
 
 See
 
 Maj. Op. 312-13 n.4.
 
 [8]
 
 He asked his second-in-command to be responsible for Williams's self-surrender, despite the fact that Deputy Lioi had not arrested anyone "since the late '90s" and despite Major Russell's admission that it was "unusual" for someone of Deputy Lioi's rank to supervise a self-surrender. J.A. 467. And Major Russell provided Williams with advice on how to
 avoid spending an entire weekend in jail, advice that was not routinely given to those with outstanding arrest warrants. J.A. 277-78.
 

 While Major Russell's relationship with Williams alone is not dispositive of Appellants' claim, it informs a factfinder's view of Major Russell's conduct. With respect to that conduct, there is a dispute-a dispute that even the majority acknowledges, Maj. Op. at 326-27-as to whether Major Russell ordered that the warrant be "pulled," or diverted from the regular course of processing. Major Russell testified in deposition that he was unaware of the warrant until it had already reached Officer Byrd, the day after it was issued and brought directly to the precinct, that he did not pull the warrant after Officer Arroyo picked it up, and that he never possessed it. However, Deputy Lioi testified that after Williams told Major Russell about the warrant, Major Russell "had the warrant pulled." J.A. 270. Moreover, Officer Arroyo testified that he would have bypassed Central Records in this case only upon a superior's orders. And Officer Byrd explained that "[s]omeone took" the warrant from her hand after she discussed the warrant with Major Russell, J.A. 108, that she never attempted service of the warrant, and that she learned that the warrant was found in her patrol car only during discovery in this case. In discussing Major Russell's communication with Williams and the subsequent "pull[ing]" of the warrant, Deputy Lioi described "the whole thing" as "unusual." J.A. 270. Yet Williams was also an unusual suspect; he was a community leader, and Deputy Lioi and Major Russell both treated him differently because of that fact.
 

 With respect to that different treatment, there is also a dispute as to whether Major Russell made "arrangements" for Williams to turn himself in at a date and time certain. Major Russell testified that he "didn't make arrangements for him to turn himself in." J.A. 455. Rather, according to Major Russell, he "simply said you need to turn yourself in, and [Williams] agreed."
 

 Id.
 

 Major Russell could not recall deciding on a date and time.
 

 Id.
 

 Major Russell also stated that it "sound[ed] odd" that Williams "pretty much prearranged when he should turn himself back in." J.A. 468. In fact, Williams's arrangement to self-surrender was the first and only such arrangement to be made at the Eastern District during Major Russell's tenure. J.A. 469.
 
 [9]
 

 The record also shows that Major Russell did in fact arrange for Williams to turn himself in. Major Russell informed Deputy Lioi of the November 13 arrangement and ensured that Deputy Lioi would be there to process Williams. J.A. 100, 249. Major Russell exchanged text messages with Williams on November 13 regarding Williams's estimated time of arrival. And after the warrant could not be located and Williams was allowed to leave the police station, Deputy Lioi testified that Major Russell agreed with him to allow Williams to "turn himself in at a later date," on Tuesday, November 18. J.A. 277. Moreover, while denying any "prearrangement that [Williams] could stay free for this long," Major Russell also acknowledged that an "agreement" was in place and explained that he was "almost handcuffed" to
 the "agreement" to allow Williams to self-surrender because police officers "had no clue where [Williams] was." J.A. 469. Yet Deputy Lioi did not hesitate to allow Williams to leave the Eastern District on November 13 after a mere 20-minute search for the warrant because the district police officers "knew [Williams]" and Deputy Lioi was "confident that we would be able to find him." J.A. 563.
 

 In light of this testimony, I disagree with the majority that any involvement by Major Russell in the willful mishandling of the warrant and the broader conspiracy to help Williams evade arrest is supported by nothing more than "impermissible speculation." Maj. Op. at 324. Major Russell knew Williams and gave his case particular attention because he was a community leader. Major Russell had the warrant pulled, reviewed the warrant right before it disappeared from Officer Byrd's hand, gave Williams advice he did not routinely give to those who are subject to an arrest warrant, told Deputy Lioi where the warrant could be found,
 
 [10]
 
 and arranged with Williams two separate dates for his self-surrender-dates that he let Williams determine and the second of which was several days after the warrant was actually located. This all took place despite the fact that, as Major Russell himself explained, open warrants are typically acted upon very quickly in the Eastern District. J.A. 470.
 

 On the evidence presented by Appellants, a reasonable jury could conclude that Major Russell-who knew Williams personally and respected him as a community leader-actively participated in the diversion and delay in execution of the warrant. Such interference with the warrant rises to the level of affirmative action.
 
 Robinson
 
 ,
 
 536 F. App'x at 345
 
 .
 

 C.
 

 I also disagree with the majority that Deputy Lioi and Major Russell did not enhance the danger to Mrs. Williams. In our prior opinion in this case, we determined that "Lioi's alleged affirmative acts with his co-conspirator, Cleaven Williams, to avoid arrest directly enabled Mr. Williams to perpetrate the harm to Mrs. Williams."
 
 Robinson
 
 ,
 
 536 F. App'x at 345
 
 . In my view, nothing in the now-developed record supports the opposite conclusion as a matter of law.
 

 First, in relying heavily on the defense expert's testimony that Williams was likely to be released on his own recognizance or on bond within 24 hours of his arrest, the majority overlooks other critical evidence in the record.
 
 See
 
 Maj. Op. at 331-32 (citing J.A. 128). One of the reasons Williams gave for wanting to delay his arrest was that he needed time to raise money for his bail. J.A. 100. Therefore, even if Williams were released on bond-which, of course, was a decision left to the sole discretion of the judge and over which the expert ultimately had no say-the record suggests that he would not have been able to make the bond payment to be released from jail. Moreover, if Williams had been arrested on Friday, November 14 (after the warrant was located), that weekend, or even Monday morning, it is not at all certain that he would have been released from custody by the time his wife left the court proceeding.
 

 More importantly, though, because Williams was a community leader and their acquaintance, Deputy Lioi and Major
 Russell affirmatively acted so that Williams's arrest was delayed, and their acts "creat[ed] the opportunity for [Williams] to murder his wife."
 
 Doe
 
 ,
 
 795 F.3d at 440
 
 (discussing and distinguishing
 
 Robinson
 
 ). Although the majority goes to great lengths to downplay the relationship between Williams and the officers, Maj. Op. at 312-13 & n.4, 324-25 & n.14, the record undisputedly shows that both officers viewed Williams as someone to be treated differently because he was a community leader. Williams was not the ordinary suspect. He enjoyed the special favor of Deputy Lioi and Major Russell, and the officers' conduct implicitly assured Williams that he would not be arrested until the date of his choosing. The officers knew how to locate him, yet they did not serve the warrant. Deputy Lioi provided him with unusual supportive letters, told him to avoid forcing the officers' hands to arrest him, and told him that he trusted him. Both officers ultimately made arrangements that allowed Williams to stay out of jail until the date that
 
 he
 
 requested.
 
 [11]
 

 To be clear, the nexus between the officers' affirmative acts and the enhanced danger to Mrs. Williams does not turn on whether the officers had knowledge of Williams's specific intention to kill his wife. Williams told the officers that he needed the additional time to raise capital for bail, assist his mother, and take care of other unspecified matters. It was unbeknownst to the officers that Williams had more sinister plans.
 

 But the officers' ignorance of those plans is not dispositive of the question of liability. Contrary to the majority's conclusion, both officers did have "personal knowledge" that Williams posed
 
 some
 
 threat to Mrs. Williams's safety. Maj. Op. at 331. Mrs. Williams had in fact sought police protection from her husband.
 
 Cf.
 
 Maj. Op. at 330 ("[N]o evidence shows that Mrs. Williams or anyone else on her behalf ever approached Lioi or Russell to seek protection from her husband."). She sought a protective order, and a warrant was issued for her husband's arrest on domestic assault charges. Major Russell was informed by Williams that his wife had "got some papers on him," J.A. 706, and personally saw the warrant right after it was issued. Deputy Lioi was also aware of the warrant, certain that it had issued, and exchanged text messages with Williams about the importance of avoiding his wife because "she could say you did anything" and could tell the police that she was "afraid" of Williams. J.A. 702, 705. The officers knew that Williams's assault of his wife was supported by probable cause and that she would likely express fear of her husband if she saw him again. Deputy Lioi was even "afraid of" Williams's "method to [his] madness." 689-90.
 

 It is not impermissible speculation, nor does it require a great leap, to conclude that on this evidence, the officers knew that Williams posed some level of danger to his wife while he remained free from arrest. That is, an increased danger to Mrs. Williams's safety was the natural and foreseeable consequence of the officers' affirmative acts to delay Williams's arrest on the assault warrant. It was not the "indirect and incidental result" of the police department's lack of enforcement.
 

 Town of Castle Rock
 
 ,
 
 545 U.S. at 767
 
 ,
 
 125 S.Ct. 2796
 
 (quoting
 
 O'Bannon v. Town Court Nursing Ctr.
 
 ,
 
 447 U.S. 773
 
 , 787,
 
 100 S.Ct. 2467
 
 ,
 
 65 L.Ed.2d 506
 
 (1980) ). Rather, as we previously held, the officers' conduct "directly enabled [ ] Williams to perpetrate the harm to Mrs. Williams" and, therefore, "affirmatively placed [Mrs. Williams] in a position of danger."
 
 Robinson
 
 ,
 
 536 F. App'x at 345
 
 (second alteration in original) (quoting
 
 Wood v. Ostrander
 
 ,
 
 879 F.2d 583
 
 , 589 (9th Cir. 1989) ).
 

 In concluding that the causal nexus is lacking here, the majority relies improperly, in my view, on our decisions in
 
 Doe
 
 and
 
 Pinder
 
 . Those cases rested primarily on the finding that the defendants did not affirmatively act.
 
 See
 

 Doe
 
 ,
 
 795 F.3d at 441
 
 ("Rosa's alleged 'affirmative acts' boil down to a particular inaction.");
 
 Pinder
 
 ,
 
 54 F.3d at 1176
 
 ("Pinder's case is purely an omission claim."). And to the extent that
 
 Doe
 
 found that there was an insufficient nexus between the alleged conduct and the harm to the victim because the conduct occurred "beyond the context of immediate interactions between the [state actor] and the plaintiff,"
 
 Doe
 
 is readily distinguishable as the defendant there "did not meet or speak with the [plaintiffs], and by all accounts, was not even aware the [plaintiffs] existed."
 
 Doe
 
 ,
 
 795 F.3d at 441
 
 (first alteration in original) (citation omitted).
 

 I also am not persuaded that Williams's pre-existing risk to his wife means that nothing the officers did enhanced the danger to Mrs. Williams. As we explained in
 
 Doe
 
 - while distinguishing
 
 Doe
 
 from our prior decision in this case-the officers here "substantially changed a pre-existent danger" to Mrs. Williams; they did not "simply fail to intervene to stop it."
 

 Id.
 

 at 440
 
 . For "[t]hough the risk of domestic abuse already existed, the officer[s] 'directly enabled [Williams] to perpetrate the harm to [his wife]' and 'affirmatively placed [Mrs. Williams] in a position of danger.' "
 

 Id.
 

 (quoting
 
 Robinson
 
 ,
 
 536 F. App'x at
 
 345 ). It was the inescapable facts of the officers' affirmative actions that kept Williams out of jail and thus made viable his plan to murder his wife. While the officers were unaware of that murderous plot, a jury could reasonably find that they did conspire to allow Williams to choose the date of his arrest and to remain free from arrest until that date. And it happened that Williams chose to submit to arrest the day after his wife's protective order hearing-the day after he knew with certainty where she would be and at what time, and the day after he fatally stabbed her. Therefore, to hold as a matter of law that Mrs. Williams faced the same risk of death at the hands of her husband regardless of the officers' actions is to do the very thing of which the majority accuses Appellants-engage in impermissible speculation.
 

 Appellants have presented evidence that Deputy Lioi and Major Russell placed Mrs. Williams in greater danger, and a jury should decide whether the nexus requirement is satisfied.
 

 D.
 

 Finally, I cannot agree that Deputy Lioi and Major Russell are entitled to qualified immunity.
 

 In finding that it was not clearly established in 2008 that an officer's "decision to allow self-surrender rather than aggressively serve a misdemeanor arrest warrant" would be a constitutional violation, the majority again improperly construes the disputed facts of this case in the light most favorable to the wrong party. Maj. Op. at 332. As the Supreme Court has emphasized, it is critical that courts evaluating a defendant's entitlement to qualified immunity at the summary judgment stage construe disputed facts and draw all reasonable
 inferences in favor of the non-movant, "even when, as here, a court decides only the clearly-established prong of the [qualified immunity] standard."
 
 Tolan v. Cotton
 
 ,
 
 572 U.S. 650
 
 , 657,
 
 134 S.Ct. 1861
 
 ,
 
 188 L.Ed.2d 895
 
 (2014). This is because courts define the clearly established right at issue "on the basis of the 'specific context of the case.' "
 

 Id.
 

 (citation omitted). Therefore, our review of a summary judgment order must "take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions."
 

 Id.
 

 ;
 
 West v. Murphy
 
 ,
 
 771 F.3d 209
 
 , 213-14 (4th Cir. 2014). By defining the right at issue in the way that it does-as nothing more than a right to be free from a police officer's failure to aggressively serve an arrest warrant and to instead allow the subject of a warrant to self-surrender-the majority accepts Deputy Lioi and Major Russell's construction of the record evidence, effectively "weigh[ing] the evidence and resolv[ing] disputed issues in favor of the moving party."
 
 Tolan
 
 , 572 U.S. at 657,
 
 134 S.Ct. 1861
 
 (quoting
 
 Anderson v. Liberty Lobby, Inc.
 
 ,
 
 477 U.S. 242
 
 , 249,
 
 106 S.Ct. 2505
 
 ,
 
 91 L.Ed.2d 202
 
 (1986) ). This is patently improper.
 

 Id.
 

 Moreover, the mere lack of binding precedent in 2008 regarding the application of the state-created-danger doctrine in this context is insufficient grounds to conclude that the right at issue was not clearly established. It is settled that an officer can be placed on notice that an action is unconstitutional even when "the very action in question" has not previously been found unlawful.
 
 Hope v. Pelzer
 
 ,
 
 536 U.S. 730
 
 , 739,
 
 122 S.Ct. 2508
 
 ,
 
 153 L.Ed.2d 666
 
 (2002) ). That is, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."
 

 Id.
 

 at 741
 
 ,
 
 122 S.Ct. 2508
 
 . As the majority concedes, the general right to be free from affirmative state conduct that creates or enhances the danger that a person faces at the hands of a private citizen was clearly established at the time of Deputy Lioi and Major Russell's actions. And while there may have been no binding precedent addressing the specific circumstances of the case at hand, it requires little more than common sense to understand that a police officer could face liability when she acts to assist the subject of an arrest warrant in evading arrest until a date of his own choosing.
 
 See
 
 id.
 

 (determining that a constitutional violation, though novel, "was so obvious" that the Court's case law "gave respondents fair warning that their conduct violated the Constitution"). Such conduct is not the failure to act that
 
 DeShaney
 
 and
 
 Pinder
 
 had rejected as a basis for liability. Nor is it a simple exercise of police discretion in executing warrants that the Supreme Court spoke of in
 
 Town of Castle Rock
 
 . Rather, it is a "misuse of state authority," which before 2008 had been held to violate the Due Process Clause.
 
 Bright v. Westmoreland Cty.
 
 ,
 
 443 F.3d 276
 
 , 282 (3d Cir. 2006) ;
 
 Natale v. Town of Ridgefield
 
 ,
 
 170 F.3d 258
 
 , 262 (2d Cir. 1999) ("[G]ross abuse of governmental authority [ ] will offend the substantive component of the Due Process Clause.");
 
 see also
 

 Cromer v. Brown
 
 ,
 
 88 F.3d 1315
 
 , 1329 n.9 (4th Cir. 1996) ("In deciding whether [a plaintiff] is asserting a clearly established right, we may examine the pre-existing law outside this circuit." (citing
 
 Pinder
 
 ,
 
 54 F.3d at
 
 1176-78 )).
 

 In short, this is not a case "in which an officer would be required to reason backward from case law 'at a high level of generality' to determine whether his conduct violated a constitutional right."
 
 Harris v. Pittman
 
 ,
 
 927 F.3d 266
 
 , 281 (4th Cir. 2019) (citing
 
 Ashcroft v. al-Kidd
 
 ,
 
 563 U.S. 731
 
 , 741,
 
 131 S.Ct. 2074
 
 ,
 
 179 L.Ed.2d 1149
 
 (2011) ). I would find that Deputy Lioi and Major Russell are not entitled to qualified immunity.
 

 III.
 

 Contrary to the majority's holding, this is not a case of a negligent failure to act. This is not a case in which officers "had no hand in creating the danger but simply stood by and did nothing when suspicious circumstances dictated a more active role for them."
 
 Doe
 
 ,
 
 795 F.3d at 440-41
 
 (brackets and citation omitted). The officers here
 
 took
 
 an "active role." They actively allowed and even helped Williams to evade an arrest warrant for which there was probable cause, despite their knowledge of the pending domestic assault charges.
 

 If this case does not present a jury question under a state-created danger theory, it is hard to imagine what would. Must the officers have placed the knife in Williams's hand, diverted the entire police force from the steps of the courthouse where Mrs. Williams was stabbed, and themselves assisted in the killing of Mrs. Williams, as the State suggested during oral argument? The bar to recovery under the theory is a high one, but surely not that high. Indeed, it is imperative in these cases that we refrain from finding that "the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is."
 
 Bowers v. DeVito
 
 ,
 
 686 F.2d 616
 
 , 618 (7th Cir. 1982). Before this case, our Court had not encountered a case in which the line between inaction and action was crossed. It is disheartening to see that, when finally faced with a record that supports a state-created-danger due process claim, the Court casts it aside into the pile of omission claims.
 

 I would instead find that the law of the case applies, that Appellants have come forward with sufficient evidence to support their due process claim, and that they are entitled to have a jury decide whether Deputy Lioi and Major Russell affirmatively enhanced the danger to Mrs. Williams. And because the disputed facts underlie Appellants' state claims of gross negligence, wrongful death, and survival, I would reverse summary judgment on those claims as well.
 

 As Officer Byrd explained, "when you are in roll call, they give you like the information that's on your post." J.A. 105.
 

 The majority cites to an affidavit of Sergeant Todd Tugya that recounts the details of a conversation Sergeant Tugya had with Officer Byrd during the search for the warrant. Maj. Op. at 313. Those statements are inadmissible hearsay.
 
 See
 
 Fed. R. Evid. 802. Although the majority suggests that the statements are admissible to show the effect of Officer Byrd's remarks on Sergeant Tugya's search for the warrant, Maj. Op. at 325 n.15, the majority cites to the statements for their truth-that Officer Byrd had the warrant, had attempted to serve it, and had left it in the visor of her patrol car,
 
 id.
 
 at 313. Because of this, I do not believe that an exception to the rule against hearsay applies, and the majority improperly considers Sergeant Tugya's affidavit.
 
 See
 
 Fed. R. Civ. P. 56(c) ;
 
 U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.
 
 ,
 
 64 F.3d 920
 
 , 926 (4th Cir. 1995) ("[H]earsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment.");
 
 see also
 

 Niblock v. Mercedes Benz Credit Corp.
 
 , (Table), No. 97-1229,
 
 1998 WL 27153
 
 , at *4 (4th Cir. Jan. 27, 1998) (affirming district court's determination that affidavit did not contain "competent, admissible evidence" because its statements were inadmissible hearsay).
 

 Even if Sergeant Tugya's affidavit statements were admissible, they are contradicted by Officer Byrd's deposition testimony that after her conversation with Major Russell three days earlier, someone took the warrant from her hand and it "disappeared." J.A. 108. The affidavit also contradicts Officer Byrd's testimony that she first became aware that the warrant was located in her patrol car during her deposition in this case. J.A. 107. By portraying the facts related to Officer Byrd's possession of the warrant in the light least favorable to Appellants, the majority ignores the contradictory evidence and flips the summary judgment standard on its head.
 

 When asked in deposition about whether he would have issued a similar letter for someone that Lioi did not know personally, Lioi responded, "[p]robably not, no." J.A. 288.
 

 The 2003 warrant was based on an incident in which Williams fired a gun into a car. J.A. 308.
 

 Appellants' claims against Major Russell were brought after our decision affirming denial of the motion to dismiss the claims against Deputy Lioi.
 

 The majority cites to
 
 Wiest v. Tyco Electronics Corp.
 
 ,
 
 812 F.3d 319
 
 (3d Cir. 2016), for the proposition that the law-of-the-case doctrine "poses no bar to normal reassessment of past holdings based on a different procedural posture when, as is the case in the progression from review of a motion to dismiss to a motion for summary judgment, that later review expands the court's inquiry based on development of actual facts underlying a plaintiff's claims." Maj. Op. at 318.
 
 Wiest
 
 , however, does nothing to support the majority's view that the law of the case does not apply here. In
 
 Wiest
 
 , the Third Circuit rejected the plaintiff's argument that the defendant's summary judgment motion "was procedurally barred" by the district court's prior determination that the complaint stated a claim.
 
 812 F.3d at 329-30
 
 . That is not the case here. Neither Appellants nor I assert that summary judgment is barred altogether because of the favorable motion-to-dismiss decision. Rather, as the
 
 Wiest
 
 panel appropriately explained, the question now presented to the Court is whether Appellants have "come forward with sufficient evidence from which a reasonable jury could find that the [complaint's] allegations are, indeed, true."
 

 Id.
 

 at 330
 
 (citation omitted). To that question, I believe the answer is a resounding "yes."
 

 When Deputy Lioi was asked "how many other times have you written a letter for somebody" like the letters he wrote for Williams, Deputy Lioi responded "[r]emember, this was an unusual circumstance based on the fact that we knew this guy as a community leader." J.A. 287. As the majority appears to accept, the reasonable inference can be made that Deputy Lioi had never previously written such letters.
 

 In attempting to minimize the relationship between Williams and the police officers, the majority relies on statements made by those officers that Major Russell did not ask that Williams be given any special treatment. Maj. Op. at 312-13 n.4. These are nothing more than self-serving statements that are contradicted by other evidence in the record, as I discuss. In fact, Major Russell makes other self-serving statements that clearly are not borne out by the record. For example, he testified that if the officers "knew where [Williams] was he would have been arrested at that time, especially if [the officers] had that warrant in hand." J.A. 468-69. Yet, the warrant was in the hands of the officers as of Friday, November 14; Deputy Lioi testified that they knew how to locate Williams; and yet Williams was not arrested at that time and instead was permitted to prearrange for a second time his self-surrender four days later-an arrangement that Major Russell endorsed.
 

 The majority highlights testimony that 15 to 20 people self-surrender in the Eastern District each year. Maj. Op. at 326 (citing J.A. 468). The record shows, however, that those people do not prearrange their self-surrender. J.A. 468. Williams's case was the only case of a prearranged self-surrender in the Eastern District that Major Russell could recall.
 

 Id.
 

 at 468-69
 
 . In fact, Major Russell characterized such a pre-scheduled self-surrender as "odd."
 

 Id.
 

 at 468
 
 .
 

 Again, the majority's reliance on the statements in Sergeant Tugya's affidavit about his conversation with Officer Byrd regarding the location of the warrant are inadmissible hearsay.
 
 See supra
 
 , note 2.
 

 Neither officer was "handcuffed" to the self-surrender arrangements that they made with Williams, as Major Russell and the majority suggest. J.A. 469;
 
 see
 
 Maj. Op. at 326 (explaining that the officers "wanted to keep [Williams] communicating and cooperating with them rather than go silent, so they were willing to have him return to self-surrender"). Williams was a known community leader, communicated openly with both officers, and Deputy Lioi was confident that they could locate him.